37 Cal.App.4th 721 (1995)
43 Cal. Rptr. 666
In re TENEKA W. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN'S SERVICES, Plaintiff and Appellant,
v.
DRAKE W., SR., Defendant and Respondent.
Docket No. B082593.
Court of Appeals of California, Second District, Division Two.
August 8, 1995.
*723 COUNSEL
De Witt W. Clinton, County Counsel, Joe Ben Hudgens, Principal Deputy County Counsel, and Erica Broido for Plaintiff and Appellant.
Jane Winer, under appointment by the Court of Appeal, for Defendant and Respondent.
*724 OPINION
BRANDLIN, J.[*]
Los Angeles County Department of Children's Services (DCS) appeals from an order entered pursuant to section 366.26 of the Welfare and Institutions Code,[1] determining that although the minors Teneka W. (Teneka) and Drake W., Jr. (Drake Jr.), were adoptable, termination of the parental rights of their father Drake W., Sr. (Drake Sr.), would be detrimental to them.[2] The court subsequently ordered legal guardianship instead of adoption.
In 1992, Drake Sr. brutally killed his wife and the minors' mother, Josephine. He had also physically abused the minors. He is now serving a 12-year prison term for the homicide. The court-appointed expert testified that the minors would benefit more from an adoptive placement than from continued contacts with the father. Nonetheless, the trial court declined to free the minors for adoption.

FACTS AND PROCEDURAL EVENTS
Three weeks after the homicide, DCS filed a petition on behalf of Amia B. (Amia) (the minors' eleven-year-old half sister), Teneka (age three), and Drake Jr. (age one and one-half), alleging the minors were persons described by section 300 and thus within the juvenile court's jurisdiction.
The court sustained allegations that the minors had been "periodically exposed to violent confrontations between their mother and ... father that endangered their physical and emotional safety. Such confrontations have occasionally included the use of deadly weapons.... [¶] On or about June 1992, and on prior occasions [Drake Sr.] ... hit minors Drake [Jr.] and *725 Teneka with a belt and inflicted bruises to minors['] bodies. Further, minors' father bit minor Teneka on the neck and inflicted bruises to minor's neck. Such punishment was excessive and caused minors unreasonable pain and suffering. [¶] On or about June 1992, and on prior occasions, [Drake Sr.] hit minor Amia with a belt and inflicted bruises to minor's arms and legs. Further, on or about March 1992, [Drake Sr.] broke minor Amia's thumb. Such punishment was excessive and caused minor unreasonable pain and suffering. [¶] Minors Teneka and Drake [Jr.]'s father is incarcerated and is unable to care for the minors." The court declared the minors dependent children of the court and found that returning the minors to Drake Sr. would create a substantial risk of detriment to their physical or emotional well-being. It ordered reunification services.
The court subsequently ruled that there was no substantial probability that the minors would be returned to their father within six months. It terminated reunification services, ordered a psychological evaluation (Evid. Code, § 730), and set the matter for determination of a permanent placement plan. In August 1993, the court ordered the minors jointly placed with the maternal aunt and the paternal grandmother pending the selection of a permanent placement plan.
The case came on for a section 366.26 selection and implementation hearing. The maternal aunt wished to adopt Teneka, Drake Jr., and Amia. A paternal uncle who had shared child care responsibilities with the paternal grandmother sought to adopt Teneka and Drake Jr. The trial court found the children to be adoptable. Drake Sr. then introduced evidence to show that he had maintained regular visitation and contact with the minors at the state prison and that the minors would benefit from continuing their relationship with him, in an attempt to avoid termination of his parental rights. (§ 366.26, subd. (c)(1)(A).)
Drake Sr. called the psychologist whom the court had ordered to evaluate the minors, Michael P. Ward. Dr. Ward recommended that Drake Sr.'s parental rights be terminated in order to free the children for adoption. He stated that his preference would be for an "open adoption" in which the father might have yearly or twice yearly contact with the children, but that if the choice were adoption with no contact or no adoption, he would choose adoption. He reasoned that Teneka and Drake Jr. could be united with their half-sister at the home of the maternal aunt, who was providing a good home for Amia, and that the minors were likely to suffer a great deal of conflict as they approached adolescence and realized the enormity of their father's crime. When asked if it would be beneficial for the minors to maintain a relationship with their father, Dr. Ward stated, "I am concerned that there *726 could be long-term detriment to the children when they're older and trying to deal with this whole situation." When asked if continuing a relationship based on alternate weekend visits benefited the minors, Dr. Ward replied, "I would say not in a long term sense, in the whole context of the case, no."
Dr. Ward had not interviewed Drake Sr. Drake Sr. was transported to the juvenile court for the hearing. He testified to the circumstances of the homicide. He gave inconsistent accounts of the event. He testified that Josephine had been using cocaine; she struck the first blow; she was fatally stabbed in the course of a struggle without the blade ever leaving her hand; she was standing in the living room when he left the apartment to summon help. He testified that Drake Jr. was at a downstairs neighbor's home and Teneka was with a relative at the time of the killing. He testified that he felt responsible for Josephine's death and was receiving counseling, taking parenting classes, and participating in classes for abusers. He testified his family had brought the minors to the prison once or twice a month, and he wrote to them twice a week.
Drake Sr. also called Teneka to testify. Her testimony was taken in chambers after she expressed fear of her father. She testified that she loved and missed and enjoyed visiting her father. She also testified that she feared her father "Because he scared me.... When at my mommy's house. He was beating mommy up." She testified she saw him beat up her mother more than once, that she was afraid he would beat her up, and indicated she is afraid when she visits him on the weekends because he killed her mother.
Drake Sr.'s brother, Ernest W., testified that he and the paternal grandmother brought the minors to visit their father at prison. He stated that Teneka cried when she left the prison.
DCS called as rebuttal witnesses Los Angeles County Sheriff's deputies who handled the homicide call. Deputy Robert Erickson testified that Drake Sr. told him that he was arguing with his wife over money for drugs and she hit him on the head, knocking him unconscious with an ashtray, and that when he regained consciousness he found she had committed suicide. Drake Sr. gave him inconsistent statements regarding whether Drake Jr. was in the home during the event. Deputy Erickson testified that Josephine's throat had been cut, that she had both fresh and old bite wounds on her face and body, and that she had been gouged in the head. When the police arrived, they found Josephine cleaned of blood and propped up in the bathtub. Drake Jr., who was then approximately 18 months old, was in the apartment, wrapped in a bloody blanket. They found blood and signs of a struggle throughout the home, except in the bathroom, where the walls had been recently washed.
*727 Sheriff's Detective Robert Havercroft testified that Drake Sr. told him his wife had committed suicide, but that his stories did not remain consistent. The detective stated that a message, "`No, Jo, Stab, Drug,'" had been written in blood on a kitchen wall.
DCS introduced photographs of Drake Sr., taken on the date of the killing, which show only superficial scratches and cuts to his body.
Talisa Y., a cousin of the minors, testified she had seen Drake Sr. hit Teneka with his hand and with a belt and had seen welts or bruises on Teneka's body after he had hit her. She testified that she had also seen him hit the children's mother.
Amia testified that Drake Sr. had hit her often; that he once hit her thumb, causing it to break or sprain; and he had hit her with his hands and a belt hard enough to cause bruises. She also described seeing Drake Sr. hit both Teneka and Drake Jr. with his hands and belts. She explained that Drake Sr. and her mother fought a lot, and that she would take the minors into her room when they were fighting. She testified she wanted her brother and sister to live with her at their maternal aunt and uncle's home. She said she knew Drake Jr. was present when Drake Sr. killed their mother because when he was 19 months old and visiting her he had said, "`Mommy and Daddy in the bathtub.'" When asked if she was taking a bath, he said, "`No, Daddy put Mommy in the bathtub.'"
On this evidence, the trial court decided not to terminate Drake Sr.'s parental rights, and referred the matter for guardianship proceedings. The court found that "termination of parental rights would be detrimental to the children because the father has maintained regular visitation and contact with the children which was clearly established by the evidence and that the children would benefit from continuing this relationship."
Drake Sr. asserts that an order pursuant to section 366.26 finding guardianship to be the appropriate plan is not appealable because further proceedings in the trial court are required to establish the guardianship. In the present case, the trial court has since issued its final order appointing a paternal uncle as guardian. Assuming Drake Sr.'s position is correct (see In re Twighla T. (1992) 4 Cal. App.4th 799, 802-803 [5 Cal. Rptr.2d 752]; In re Johnny M. (1991) 229 Cal. App.3d 181, 187 [279 Cal. Rptr. 693]), we deem the appeal to have been taken from the order appointing a guardian by a premature notice of appeal. (Cal. Rules of Court, rule 2(c).)

DISCUSSION
By the time the court made the order appealed from, it had already determined that Teneka and Drake Jr. could not be returned to their *728 parents. (1) A case reaches the selection and implementation stage only after parental unfitness has been shown, despite the presumption favoring placement with the parents. Once reunification services are terminated, the focus of the welfare agency "shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child." (In re Marilyn H. (1993) 5 Cal.4th 295, 305 [19 Cal. Rptr.2d 544, 851 P.2d 826].)
Having reached the selection and implementation stage, the juvenile court was left with three alternatives: adoption, guardianship or long-term foster care. (In re Taya C. (1991) 2 Cal. App.4th 1, 7 [2 Cal. Rptr.2d 810].) In deciding between these alternatives, the juvenile court is next called upon to ascertain the adoptability of the minor. "If there is clear and convincing evidence that the child will be adopted, and there has been a previous determination that reunification services should be ended, termination of parental rights at the section 366.26 hearing is relatively automatic. [Citation.]" (In re Zacharia D. (1993) 6 Cal.4th 435, 447 [24 Cal. Rptr.2d 751, 862 P.2d 751].) The prior decision to terminate reunification services constitutes a sufficient basis to terminate parental rights unless the termination would be "detrimental" due to one of several circumstances enumerated in section 366.26 subdivision (c)(1)(A) - (D). Here, the court determined the children were adoptable.
(2) In selecting a permanent plan for an adoptable child, the court must bear in mind the basic preference for adoption over nonpermanent forms of placement, including guardianship. "The Legislature has decreed ... that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them." (In re Beatrice M. (1994) 29 Cal. App.4th 1411, 1419 [35 Cal. Rptr.2d 162].) A guardianship is "not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature." (Jones T. v. Superior Court (1989) 215 Cal. App.3d 240, 251 [264 Cal. Rptr. 4].)
(3a) In the present case, the trial court found that the children would suffer detriment from the loss of a long-term relationship with their father, and instead of adoption chose guardianship. We cannot sustain that determination. "`Interaction between [a] natural parent and child will always confer some incidental benefit to the child....'" (In re Beatrice M., supra, 29 Cal. App.4th at p. 1419.) (4) Even "frequent and loving" contact with natural parents to whom a child cannot be returned, however, may be insufficient to justify the selection of guardianship in place of adoption. (Id. *729 at p. 1418.) The parent-child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (In re Autumn H. (1994) 27 Cal. App.4th 567, 575 [32 Cal. Rptr.2d 535].)
(3b) While we recognize the trial court's concern that severing all ties with Drake Sr., with whom Teneka appeared to have a bond, could be detrimental to the minors, the evidence does not sustain its conclusion that the strength and quality of that relationship outweighed the benefits of a permanent home. The relationship was permanently marred by Drake Sr.'s decision to kill the minors' mother. The evidence regarding Drake Sr.'s relationship with Drake Jr., who did not testify, was scant. Moreover, the trial court's choice resulted in separating Teneka and Drake Jr. from their older sister, Amia, with whom Dr. Ward testified they were also bonded. In light of the father's history of family violence and the expert testimony regarding its probable effect on these minors, the evidence did not support a determination that they would benefit more from a continuing relationship with him than from adoption in a stable, permanent home.

DISPOSITION
The order appealed from is reversed. The proceeding is remanded to the juvenile court with directions to conduct a new selection and implementation hearing consistent with this opinion.
Boren, P.J., and Nott, J., concurred.
Respondent's petition for review by the Supreme Court was denied November 2, 1995.
NOTES
[*] Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.
[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.
[2] Section 366.26 states in relevant part: "(c) At the hearing the court shall proceed pursuant to one of the following procedures: [¶] (1) The court shall terminate parental rights only if it determines by clear and convincing evidence that it is likely that the minor will be adopted. If the court so determines, the findings pursuant to subdivision (b) or paragraph 1 of subdivision (e) of Section 361.5 that reunification services shall not be offered, or the findings pursuant to subdivision (e) of Section 366.21 that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or contact the child for six months or that the parent has been convicted of a felony indicating parental unfitness, or pursuant to Section 366.21 or 366.22 that a minor cannot or should not be returned to his or her parent or guardian, shall then constitute a sufficient basis for termination of parental rights unless the court finds that termination would be detrimental to the minor due to one of the following circumstances: [¶] (A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship."