[No. H015265. Sixth Dist. Nov. 26, 1996.]

In re JOSE V., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
MONICA F., Defendant and Appellant.

## Counsel

Carole Greeley, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven M. Woodside, County Counsel, and Arlene V. Rozul, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

BAMATTRE-MANOUKIAN, J.—The mother of the minor child, Jose V., appeals from an order following a Welfare and Institutions Code section 366.26 hearing,[1] which terminated her parental rights and placed Jose for adoption. She argues the court erred in failing to consider guardianship rather than adoption. We will affirm the order.

### Background

Jose V. was born on October 6, 1992. His mother, Monica F., was 14 years old at the time and was herself a dependent child of the court. Jose was taken into protective custody in August of 1993 when the mother's foster parent reported that the mother had ingested methamphetamine in the presence of her baby and that he had grabbed her hand and licked some of the drug off her finger.

The mother signed an informal supervision agreement and Jose was returned to her care. She agreed to attend school, to participate in a teen support group, a parenting group, and drug counseling and to follow the rules at the foster home. The mother failed to comply with the terms of the informal agreement and ran away from the foster home, taking Jose with her.

In December of 1993 Jose was again taken into protective custody and the department of family and children's services (the Department) filed a petition under section 300, subdivision (b), alleging that the mother was not

---

[1]All statutory references are to the Welfare and Institutions Code.

providing for Jose on a regular basis. The mother and Jose were living with Jose's maternal grandmother, Esther F., who was unwilling to continue providing care for Jose without court intervention. Esther F. told the social worker that the mother was often gone for long periods of time and she believed the mother was involved in drug use. Jose's presumed father was incarcerated in the California Youth Authority following convictions for three counts of assault with a deadly weapon. Jose was detained and permitted to remain with his maternal grandmother.

Jose was adjudged a dependent child of the court on January 13, 1994. Placement was continued with the maternal grandmother and the mother was permitted to reside in the home. A service plan was developed and the mother agreed to participate in parenting classes, family and drug counseling and drug testing, and to attend school.

At the six-month review in June of 1994, the mother had attended counseling and other classes only sporadically and had failed to comply with drug testing. She had a new boyfriend and was pregnant with her second child. Esther F., the maternal grandmother, was able to provide for Jose's basic needs, but she lived in a two-bedroom apartment with all four of her teenage children (three girls and a boy) and three small grandchildren. Two of the teenage girls were pregnant. The living situation was crowded and chaotic and the grandmother's attention was spread thin. The family had a history of drug abuse, domestic violence and dysfunction. In 1991, all of Esther F.'s children had been declared dependents of the court based on allegations that the three girls had been molested by their father for many years.

By the time of the 12-month review, the mother was living with her boyfriend. Their relationship was reported to be "abusive." She had been attending Blossoms Perinatal Center and had been participating in a program for pregnant and parenting teenagers. She was providing negative drug tests on a weekly basis. She visited Jose regularly and often brought him to her classes. On January 4, 1995, she gave birth to a baby girl. On January 23, 1995, the court extended services for another six months on the recommendation of the social worker that there was a "substantial probability" of reunification.

In May of 1995, a supplemental petition was filed alleging that Jose, who was now two and a half years old, was experiencing developmental delays and exhibiting behavioral problems. The petition further alleged that the maternal grandmother had failed to notify the Department of her whereabouts and there was some question where the grandmother and Jose actually lived. In June a psychological evaluation was ordered for Jose and he

was placed in foster care. The scheduled 18-month review was continued. During this time the mother was living with her aunt, Lucy F., and was visiting with Jose at Clover House.

Jose was returned to the children's shelter from foster care in July of 1995 because of disruptive behavior. On or around July 15, 1995, he was placed with his great aunt Lucy and the mother moved out with her baby daughter. The mother did not inform the Department where she was living.

The 18-month review hearing was held August 11 and September 14, 1995. The supplemental petition was withdrawn. A psychological evaluation revealed that Jose had significant developmental delays. These problems were believed to be "directly related to his environment." The mother had not maintained regular attendance at her various programs and classes and had been terminated from the drug program. She had a positive drug test for methamphetamine on August 10, 1995. She did not keep in contact with the social worker and was generally uncooperative. It was unknown where she was living and she had not visited with Jose since mid-July. Her boyfriend was in jail on domestic violence charges. The court ordered services terminated and set a section 366.26 hearing.

The section 366.26 hearing was eventually held on March 1, 1996. In the interim Jose continued to live with his great aunt Lucy and was thriving in that environment. Lucy F. had refused to allow the mother to visit Jose in her home because of the mother's rude and threatening behavior. The mother had visited with Jose once, in December of 1995, supervised by the social worker. The visit went well. Additional visits were authorized; however the mother refused to participate in visits at Clover House. Jose had enjoyed visits with other family members, both on his mother's and father's side.

The social worker evaluated and certified the home of Lucy F. for placement of Jose. Lucy had known Jose since his birth and was aware of his needs. She was in a long-time stable relationship and lived with her partner, John G., and their 3 children, ages 18, 14 and 10. She and her partner both worked and shared the responsibility of providing daily care and financial support for the household. Jose had formed attachments to both of them.

At the section 366.26 hearing the social worker testified that Jose was adoptable and that Lucy F. was willing to adopt him. The social worker strongly believed that Jose needed permanency in his life. She wrote: "Jose deserves the most permanent plan possible, which is adoption, so that he does not have to experience another move and more trauma associated with abandonment . . . [¶] . . . [¶] Jose is adoptable, as he has shown ability to

attach and has been observed to be developmentally appropriate. His growth in language has shown to be miraculous. There is an approved adoptive parent who is willing to adopt him . . . and a plan of adoption will provide Jose with stability and permanence in his life."

Lucy F. testified that she was willing to adopt Jose or to be his guardian. She also testified that the relationship between Jose and his mother was a close one and was beneficial to Jose. The mother and Lucy were apparently reconciled at this point. Lucy stated that if she adopted Jose she would continue to allow contact between him and his biological parents and extended family.

The court terminated parental rights and ordered Jose placed for adoption. The court specifically found that "neither parent maintained regular visitation with the child within the meaning of Welfare and Institutions Code section 366.26(c)(1)(A). The court also finds that the relative with whom the child is living is willing to adopt the child. Thus Welfare and Institutions Code section 366.26 (c)(1)(D) is not applicable. The court further finds that the child needs the permanency and stability that adoption will provide."

*Argument*

■ The mother argues that the court's order at the section 366.26 hearing must be reversed because the judge did not understand that he had the discretion to select guardianship rather than adoption as the permanent plan for Jose. She points out that attorneys for both parents and for Jose advocated guardianship as the most appropriate plan in this case but that the court believed it had no choice but to order adoption. The mother argues that the court erred in not allowing or considering evidence that guardianship would be in Jose's best interests because it would promote, rather than sever, family ties.

We reject these arguments. We find that the court selected adoption for Jose based both on the evidence in the record and on the statutory preference for adoption as the most permanent plan and therefore the one best serving Jose's interests.

The purpose of the selection and implementation hearing is to "provide stable, permanent homes for [dependent children]." (§ 366.26, subd. (b).) A juvenile court at a section 366.26 hearing must select one of three plans for the child: adoption, guardianship or long-term foster care. (§ 366.26, subd. (b)(1)-(4); *In re Taya C.* (1991) 2 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 810].) The court may terminate parental rights and order adoption for the child only

if it finds by clear and convincing evidence that it is likely the minor will be adopted. (§ 366.26, subd. (c)(1).) Findings made in previous hearings are then sufficient to support the termination of rights unless the court finds that termination would be detrimental to the child under one of four circumstances listed under section 366.26, subdivision (c)(1)(A) through (D)(hereafter subdivision (c)(1)(A) through (D)).[2] The court found that none of these circumstances were shown in this case.

The mother contends the statutory scheme provides that the court may nonetheless exercise its discretion to order guardianship rather than adoption. The authority for this is section 366.26, subdivision (c)(4). That subdivision provides that "[i]f the court finds that adoption of the minor or termination of parental rights is not in the interests of the minor, or that one of the conditions in subparagraph (A), (B), (C), or (D) of paragraph (1) . . . applies, the court shall either order that the present caretakers or other appropriate persons shall become legal guardians of the minor or order that the minor remain in long-term foster care." The mother argues that the court's comments at the section 366.26 hearing indicate it was unaware it had discretion to order guardianship under subdivision (c)(4) even though none of the exceptions listed under subdivision (c)(1) were proven.

We disagree with the mother's characterization of the statute and the record. If a child is adoptable and none of the circumstances listed in subdivision (c)(1)(A) through (D) are present, an order for adoption as the preferred plan will be "relatively automatic." (*In re Matthew C.* (1993) 6 Cal.4th 386, 392 [24 Cal.Rptr.2d 765, 862 P.2d 765].) In order to consider ordering guardianship under subdivision (c)(4), the court must make a finding that adoption or termination of parental rights "is not in the interests of the minor." The court is therefore not authorized to exercise unfettered discretion in choosing between adoption and guardianship but rather must order adoption unless it finds that adoption does not serve the child's interests. Here the court specifically found to the contrary that "the child needs the permanency and stability that adoption will provide."

---

[2]These four circumstances are: "(A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship; (B) A minor 12 years of age or older objects to termination of parental rights; (C) The child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed; (D) The minor is living with a relative or foster parent who is unable or unwilling to adopt the minor because of exceptional circumstances, which do not include an unwillingness to accept legal responsibility for the minor, but who is willing and capable of providing the minor with a stable and permanent environment and the removal of the minor from the physical custody of his or her relative or foster parent would be detrimental to the emotional well-being of the minor."

Furthermore, it is well established that there is a strong preference for adoption as the most permanent, and thus the best, plan for a dependent child. Therefore, if the court finds the child is adoptable and that none of the exceptions apply, it is presumed, even in the absence of a specific finding by the court, that adoption is the choice that is in the child's best interests. "[T]he Legislature intended that in assessing the child's best interests in a dependency proceeding, adoption is preferable as a permanent plan if the court determines the child cannot be returned to his or her parents following a reunification period. Once the court determines adoption is feasible, the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued." (*Jones T.* v. *Superior Court* (1989) 215 Cal.App.3d 240, 249, 250 [264 Cal.Rptr. 4]; *In re Teneka W.* (1995) 37 Cal.App.4th 721, 728-729 [43 Cal.Rptr.2d 666].)

This court has also expressed the view that "guardianship is not in the best interests of children who cannot be returned to their parents." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [35 Cal.Rptr.2d 162].) "These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them." (*Ibid.*) Guardianship, since it is not irrevocable, " 'falls short of the secure and permanent placement intended by the Legislature.' " (*Ibid.*, quoting *Jones T.* v. *Superior Court, supra,* 215 Cal.App.3d at p. 251.) In sum, it will be the rule in almost every case that "where . . . the court finds the minors are adoptable, it is not required to explore guardianship or other less permanent alternatives." (215 Cal.App.3d at p. 250.)

These principles were applied recently in *In re Tabatha G.* (1996) 45 Cal.App.4th 1159 [53 Cal.Rptr.2d 93]. In that case the court found the child was adoptable and that none of the exceptions listed in subdivision (c)(1)(A) through (D) were present. The court therefore terminated parental rights and ordered the child placed for adoption. The mother appealed, arguing that the court should have considered whether the "interests of the minor" would be served by a guardianship, pursuant to section 366.26, subdivision (c)(4). The court in *Tabatha* rejected this argument. A juvenile court's determination that none of the four specified exceptions provided in subdivision (c)(1)(A) through (D) apply, the court reasoned, is "a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative." (45 Cal.App.4th at p. 1165.) "Having made the necessary findings under the statutory scheme to terminate [the mother's] parental rights, the court was not required to further consider whether Tabatha's best interests would be better served by a permanent plan of guardianship or long-term foster care." (*Ibid.*; see also *In re Keyonie R.* (1996) 42 Cal.App.4th 1569 [50 Cal.Rptr.2d 221].)

We do not agree completely with *Tabatha*'s interpretation of section 366.26, subdivision (c)(4). The court in *Tabatha* concluded that the "interests of the minor" exception in subdivision (c)(4) was not intended to be separate from those specifically stated in subdivision (c)(1)(A) through (D). However the language in subdivision (c)(4) clearly authorizes the court to order guardianship if it finds that one of the circumstances in subdivision (c)(1)(A) through (D) is present *or* it finds that adoption is not in the minor's interests. This appears to us to allow for the possibility that some circumstance or combination of circumstances could exist which would support a finding that adoption was not in the child's best interests even though none of the enumerated exceptions applied.

We do not, however, accept the mother's interpretation of the law, that section 366.26, subdivision (c)(4) obligates the court to consider guardianship in every case. We believe the rule to be derived from the statute and applicable case law is that if the court finds the child adoptable and finds no exceptions are shown under subdivision (c)(1)(A) through (D), the court is entitled to presume that termination of parental rights and adoption will be the plan best serving the child's needs. In the absence of compelling evidence to rebut this presumption, the court need not consider less permanent alternatives.

 The mother contends that the court erred here in disallowing evidence she claims could have supported a finding that adoption was not in Jose's best interests. She refers to portions of the record where counsel attempted to introduce evidence that the prospective adoptive mother, Lucy F., indicated she was willing to adopt Jose but would prefer to be his guardian. The court sustained an objection to this evidence, explaining as follows: "The fact is that it's not relevant to adoptability unless the care taker says that she's unwilling to adopt. And this witness has given an answer. . . . That's as far as the question goes as far as I'm concerned. Statute reads first consideration for the court is adoptability. . . . [¶] . . . [¶] It's mere willingness to adopt which is the adoptability issue." Later the court reiterated: "the question for me is adoptability. It's not the desire of the care taker. . . ."

Counsel further elicited evidence that Lucy F. was willing to adopt Jose only because "otherwise he might be adopted by someone else or go back into the foster care system." Lucy was not allowed to testify as to her feelings about termination of Jose's mother's parental rights. She did testify that Jose had a close relationship with his mother, whom he called "mom." She also stated that she was trying to help Jose's mother and believed that the mother had learned from her mistakes and was in the process of growing up and realizing she had responsibilities.

Lucy F.'s testimony regarding her personal preference for guardianship over adoption was irrelevant to any inquiry at the section 366.26 hearing, where the court's task was to select the plan which best served the child's interests. Under section 366.26, subdivision (c)(1)(D), the court was required to find that she was neither unable nor unwilling to adopt Jose. In her testimony she clearly stated that she was able and willing. Any additional evidence that she preferred to be a guardian had no tendency to rebut the strong presumption that adoption was the best possible plan for Jose. Likewise it did not tend to support a finding under section 366.26, subdivision (c)(4) that adoption was not in Jose's best interests. The court was entirely justified in excluding such evidence.

In regard to evidence of the close relationship between Jose and his mother and the benefit to him of continuing to have contact with her, the court did allow this testimony. The court concluded, however, that Jose "needs the permanency and stability that adoption will provide." Moreover, the evidence was that the adoptive mother would support and encourage continued contact between Jose and his birth mother and extended family.

Finally, there is no indication in the record that the court did not understand the workings of the statutory scheme governing dependency proceedings. The court had previously found that Jose could not be reunited with his mother and returned to her custody. There was clear and convincing evidence that it was likely he would be adopted and a suitable prospective adoptive parent had indicated a willingness to adopt him. None of the impediments to termination of parental rights under subdivision (c)(1)(A) through (D) were present and the court specifically found that adoption would best serve Jose's needs. Under the circumstances, the decision to terminate parental rights was relatively automatic and no exercise of discretion was required. (*In re Matthew C., supra,* 6 Cal.4th at p. 392.)

### Disposition

The order terminating parental rights and placing the minor child for adoption is affirmed.

Cottle, P. J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 19, 1997. Kennard, J., was of the opinion that the petition should be granted.