[No. B158488. Second Dist., Div. Two. Feb. 6, 2003.]

In re JOSUE G., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Appellant;
MARIA G. et al., Defendants and Respondents.

## COUNSEL

Lloyd W. Pellman, County Counsel, and Pamela S. Landeros, Deputy County Counsel, for Plaintiff and Appellant.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Respondent Maria G.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Respondent Nelson V.

## OPINION

**DOI TODD, J.**—The Los Angeles County Department of Children and Family Services (the Department) appeals under Welfare and Institutions Code section 395[1] from the order of the juvenile court following a section 366.26 selection and implementation hearing in which it selected a permanent plan of legal guardianship based on its finding that the child is not likely to be adopted. Because there is insufficient evidence to support the juvenile court's finding that the child is not adoptable, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Josue G. was 12 days old in September 1999 when he was detained in the foster home of Carmela and Fernando R., where his sister Annel V. had

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

already lived for nearly two years. The Department filed a petition under section 300, subdivision (j) on September 20, 1999, alleging that Josue's sibling had been declared a dependent of the court under section 300, subdivision (b), and that Josue's parents, Maria G. and Nelson V., had failed to comply with the case plan ordered by the juvenile court in that case, and had failed to successfully reunify with Josue's sibling, thus endangering Josue and placing him at risk of physical and emotional harm.[2]

The juvenile court sustained the petition on February 3, 2000. Thereafter, on July 11, 2000, the juvenile court terminated parental rights with respect to Annel, and in an opinion filed February 15, 2001, we affirmed the juvenile court's order. (*In re Annel V.* (Feb. 15, 2001, B142987) [nonpub. opn.].)[3]

At the six-month judicial review hearing on August 3, 2000, the Department reported that mother had completed counseling, but noted that her therapist had recommended against returning Josue to her care until she had completed at least six months of individual therapy in order "to work on unresolved personal issues." Mother objected to further counseling. She stated that she and father were both dating others and did not intend to reconcile, and she planned to move to San Jose to live with her mother when she got her children back. Father had enrolled in domestic violence counseling on January 15, 2000, but attended only four sessions and never returned. He had not appeared for any visits with Josue since about February 17, 2001, and he had had no contact with the social worker, who had been unable to locate him at his last known address.

In the meantime, Josue remained in Carmela and Fernando's care and had adjusted well to his foster home. He was in good health, up-to-date on his immunizations, and developing normally. The juvenile court ordered the Department to provide mother further family reunification services, terminated services for father, and ordered mother to attend individual counseling.

In February 2001, the Department reported to the court that, after failing to attend any therapy from July 2000 through December 4, 2000, mother had resumed individual counseling twice a week to address issues of anger management and family history. Mother continued to visit the children regularly, but the therapist noted that mother found the visits "overwhelming." She recommended that mother continue in therapy. The Department also reported that it had been unable to verify the information mother had

---

[2]When Annel was born in June 1997, her mother was also a minor. In November 1997, mother threatened to kill herself and Annel, and both Annel and her mother were detained by the Department as persons coming within the provisions of section 300.

[3]We granted the Department's request for judicial notice of the opinion pursuant to Evidence Code sections 451 and 459 in connection with this appeal on September 24, 2002.

given regarding her employment. It subsequently discovered that mother was living with father, who was supporting her financially, and that the two intended to marry, contrary to mother's representations that she was unaware of father's whereabouts. The Department noted mother's lack of candor regarding father's whereabouts and expressed concern over her lack of a stable or adequate home environment.

By the 18-month review hearing on March 21, 2001, mother had found a new home and claimed she was no longer living with father. But she acknowledged to the juvenile court that she was not in a position to have Josue returned to her care and agreed to have the matter set for a section 366.26 hearing to select and implement a permanent plan for Josue. The juvenile court found that the parents had failed to comply with the case plan, terminated family reunification services, and set the matter for a section 366.26 hearing.

At the initial section 366.26 hearing on July 18, 2001, the Department reported that it had identified adoption as the preferred permanent plan for Josue. Although Josue was happy and continued to do well in his foster home, where he had lived his whole life, Carmela and Fernando were not interested in adopting him. However, Josue's paternal grandmother had expressed an interest in adopting both Josue and Annel, and the Department had commenced an assessment of her home.

The section 366.26 hearing was continued to November 15, 2001. At that hearing the Department reported that then two-year-old Josue "appears to be a very happy child. He appears to get along well with other children and is very bonded to the foster parents who are constant figures in his life." He was also bonded to his sister, Annel, and the Department reported efforts to find an adoptive home for both of them together. Although both children had resided in the foster home since their initial placements, Carmela and Fernando were in their 70's, and did not intend to adopt the children. No prospective adoptive parents or legal guardians had yet been identified.

The juvenile court ordered that mother's visits with Josue be extended to four-hour unmonitored day visits once a week, increasing to all day (eight hours) if the visits went well and with Department having the discretion to further liberalize. The court continued the selection and implementation hearing to February 26, 2002.

In the interim review report dated February 26, 2002, the Department noted mother's transient lifestyle, identifying 12 residences known to the social worker where mother had lived since February 1999. In the status

review report dated February 6, 2002, the Department reported that mother had not visited with the children at all from December 13, 2001, through January 17, 2002. In addition, although mother had otherwise been quite consistent in visiting Josue and Annel, there was insufficient interaction between her and the two children. The social worker who had monitored the visits observed, "[m]other is more aware of the surroundings outside the visiting room [as] opposed to engaging in quality time with her children. As a result, minor Annel plays independently with the toys in the visiting room or interacts with sibling Josue, foster parents or [the social worker]." The social worker also noted little bond between mother and the children, citing the need to remind the children to acknowledge and say "goodbye" to their mother at the conclusion of the visits. During the January 24, 2002 visit, the social worker reported that mother sat on the sofa holding her newborn son during the entire visit. Josue remained close to Carmela and played with the toys in the room. When at one point he left the visiting room alone, mother did not even go after him.

Meanwhile, the Department had found a prospective adoptive family interested in a sibling group and a date was set for the children to meet them. The Department asserted that because the children were bonded to each other, it would be detrimental to their emotional well-being to be separated.

At the February 26, 2002, hearing, the court reiterated its previous visitation order, and continued the selection and implementation hearing a third time to April 15, 2002.

The Department's interim review report submitted for the April 15, 2002, selection and implementation hearing described mother's visits with Josue since the previous court hearing. Although these visits were to be four or eight hours long per the court's order, mother brought Josue back several hours early each time, complaining that he was difficult to control, she was unable to handle him, and he would not listen to her. Mother had also canceled or postponed five visits because her baby was ill or it was cold outside.

At the contested hearing the court received into evidence various reports submitted by the Department and heard testimony from Fernando and the Department social worker who had been assigned to the case since Josue was born.

Fernando testified that he and his wife, Carmela, had been Josue's foster parents since he was 12 days old, and they were ready and willing to adopt Josue and Annel. They had decided to adopt Josue and his sister because

they loved the children very much, and they had been advised by the social worker that it was possible another adoptive home would be found for the children. Although the couple—both of whom were in their 70's—had previously believed they were too old to adopt, Fernando testified that they felt "sound and strong," and they presently had no health problems.

On its own motion, the juvenile court took judicial notice that by the time Josue was 18 years old, Fernando would be 92 and Carmela would be 89. Nevertheless, Fernando testified that he felt he would be capable of caring for a teenage boy, but if for some reason he could not, his daughter would be able to assume the responsibility of taking care of the children.

The social worker testified that Josue had no medical problems, no physical limitations, and no emotional or behavioral problems. In her opinion there was no reason Josue could not be adopted. Furthermore, given the close bond and "major affection" between Josue and his foster parents, the best place for Josue was with Carmela and Fernando. She recommended they adopt him, and would not support moving him if another family were interested in adoption.

The court indicated its tentative ruling was to find that Josue was not likely to be adopted. Counsel for the Department argued that the evidence supported a finding that Josue was likely to be adopted and that the age of the prospective adoptive parents was irrelevant. Josue's attorney, joined by counsel for both parents, asked the court to find that Josue was not likely to be adopted due to his bond with his foster parents and their advanced age, and asked the court to order a permanent plan of legal guardianship.

The juvenile court announced that it was incorporating the exception under section 366.26, subdivision (c)(1)(D) (termination of parental rights would be detrimental because the child is living with a relative who is unwilling or unable to adopt because of exceptional circumstances) and standing by its tentative ruling. The court then heard further argument from counsel and concluded that although the exception did not "technically apply," nevertheless, Josue was not likely to be adopted.[4] The court stated that its finding that Josue was not adoptable was based on "the age of these particular caretakers." The court further found that Fernando and Carmela

---

[4] While the minute order for the April 15, 2002, hearing indicates that the court applied the exception under section 366.26, subdivision (c)(1)(D), the reporter's transcript clearly states otherwise. We will harmonize this conflict in the record in favor of the reporter's transcript. (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152].)

had taken exceptional care of Josue, and it was in his best interest to remain with them under a plan of legal guardianship.

The Department's appeal followed.

## DISCUSSION

At the selection and implementation hearing under section 366.26, the trial court determines whether the child is adoptable on the basis of clear and convincing evidence. (§ 366.26, subd. (c)(1); *In re David H.* (1995) 33 Cal.App.4th 368, 378 [39 Cal.Rptr.2d 313].) ■ On appeal, we review the factual basis for the trial court's finding of adoptability and termination of parental rights for substantial evidence. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 [94 Cal.Rptr.2d 693].) We therefore "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535].)

The selection and implementation hearing under section 366.26 takes place after the juvenile court finds that the parents are unfit and the child cannot be returned to them. The court first terminates reunification services (§§ 366.21, subd. (h), 366.22, subd. (a)(2)) and then sets the hearing under section 366.26. (§§ 361.5, subd. (f), 366.21, subd. (g)(3), 366.22, subd. (a)(2).) The court also orders the preparation of a report, which must include an evaluation of the parent-child relationship, the child's physical and mental condition, and any prospective adoptive placements. (§§ 361.5, subd. (g), 366.21, subd. (i), 366.22, subd. (b); *In re David H., supra,* 33 Cal.App.4th at pp. 377-378.)

On the basis of this assessment "and any other relevant evidence" (§ 366.26, subd. (c)(1)), the juvenile court must then "make one of four possible alternative permanent plans for a minor child (subd. (b)(1)-(4)). ■ The permanent plan preferred by the Legislature is adoption. [Citation.]" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1416 [35 Cal.Rptr.2d 162].) " 'The Legislature has decreed . . . that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent plan and secure alternative that can be afforded them.' " (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728 [43 Cal.Rptr.2d 666], quoting *In re Beatrice M., supra,* 29 Cal.App.4th at p. 1419; *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799 [58 Cal.Rptr.2d 684].)

*The Juvenile Court Erred in Finding Josue Was Not Adoptable.*

In this case, the juvenile court was required to determine whether a developmentally normal, happy two-and-a-half-year-old child who had resided with the same foster family almost since birth was adoptable. The evidence was overwhelming and undisputed that Josue had no medical problems, no physical limitations, and no emotional or behavioral problems. The sole reason given by the juvenile court for its conclusion that Josue was not likely to be adopted was its finding that he was closely bonded with his foster parents, who, in the court's view, would be too old by the time Josue becomes a teenager to be considered qualified adoptive parents. But the inquiry as to whether a child is likely to be adopted does not focus on the adoptive parents, but rather, on the child. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307].)

A prospective "family's suitability to adopt is irrelevant to the issue whether the minor[] [is] likely to be adopted," which is the *only* issue at the selection and implementation hearing. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 [28 Cal.Rptr.2d 82].) "The sole issue at the selection and implementation hearing is whether there is clear and convincing evidence that the child is adoptable. (§ 366.26(c); *In re Marilyn H.* [(1993)] 5 Cal.4th [295,] 300-306 [19 Cal.Rptr.2d 544, 851 P.2d 826]; *In re Sarah M.*[, *supra*,] 22 Cal.App.4th [at pp.] 1649-1650 . . . .) In resolving this issue, the court focuses on *the child*—whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1649.)" (*In re David H., supra,* 33 Cal.App.4th at p. 378.)

Although one of the factors in determining adoptability is the existence of prospective adoptive parents, "it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.) "[A] prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" (*Id.* at p. 1650.)

Here, all the evidence points to the likelihood of Josue being adopted, and the record is devoid of any evidence to support a contrary finding. The record establishes that Josue had lived in the same foster home his entire life and had developed into a healthy, happy two year old by the time of the selection and implementation hearing. In its report submitted for the initial section 366.26 hearing on July 18, 2001, the Department reported

that Josue was in good health and developing within normal age limits. Josue was walking and running without assistance, and would move his body when he listened to music. He could throw objects across the room. And he exhibited shyness around strangers. He liked to play with his foster siblings and sister.

In November 2001, the Department reported that "Josue is able to throw a ball with accuracy. He is able to turn knobs and scribble in a circular motion. He is able to climb a chair and sit down on his own. . . . Minor Josue appears to be a very happy child. He appears to get along well with other children and is very bonded to the foster parents who are constant figures in his life." And in February 2002, the Department reported that "Josue enjoys helping out in the garden when watering the plants. Josue enjoys playing with his sibling Annel and other children. Josue really enjoys playing ball by throwing or kicking them. He loves running around in the backyard."

The social worker, who had known Josue all his life, testified that Josue had no medical problems, no physical limitations, and no emotional or behavioral problems that would impede adoption. In her opinion, there was no reason Josue could not be adopted. In sum, the overwhelming evidence before the juvenile court was that "Josue is a happy two-year-old child" with no impediments to adoption.

Further, several other people in addition to Carmela and Fernando had expressed interest in adopting Josue and his sister. On July 18, 2001, the Department reported that the paternal grandmother had expressed an interest in adopting the children and the Department was in the process of assessing her home. Several months later, the Department had identified another prospective adoptive family interested in a sibling group and a date was set for the children to meet them. The fact that other families in addition to Josue's foster parents were interested in adoption establishes that Josue's "age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting [him]." (*In re Sarah M., supra*, 22 Cal.App.4th at pp. 1649-1650.)

Finally, mother argues that the plan of guardianship that afforded mother continued visitation with Josue while allowing him to continue to reside in the home of Fernando and Carmela would provide the greatest stability to Josue over the long term. Stability in an existing placement, mother maintains, "is in the best interest of the child." But there is no general "best interest" exception to the termination of parental rights and the legislative preference for adoption. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774 [109 Cal.Rptr.2d 123].)

Moreover, we are unpersuaded that guardianship rather than adoption is in Josue's best interest in any event. While guardianship may provide some measure of short-term stability over foster care, it provides none of the long-term security an adoption would ensure. The juvenile court commended Carmela and Fernando for the excellent care they had given Josue, and was concerned solely with the fact that they were over 70 years old. The court noted that if Carmela and Fernando survive to Josue's 18th birthday, they will be 89 and 92 years old respectively, and Josue will still "need parents who are able and capable of keeping up with a young vibrant 18-year-old." But a guardianship does nothing to ensure that Josue has any parent or responsible adult involved in his life when he reaches 18 who is capable of keeping up with him and willing to do so. What's more, placing Josue in a legal guardianship while Annel has been freed for adoption puts the two children in different legal positions with respect to their caretakers and to each other, and therefore adds an element of uncertainty as to whether they will be able to remain together in the future.

## DISPOSITION

The order determining legal guardianship to be the appropriate permanent plan is reversed. The matter is remanded to the juvenile court for further proceedings pursuant to section 366.26.

Nott, Acting P. J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied February 27, 2003, and the opinion was modified to read as printed above.