Filed 2/19/15  In re Jacob P. CA3

**NOT TO BE PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re JACOB P., a Person Coming Under the Juvenile Court Law. | C077118 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. JD233496) |
| Plaintiff and Respondent, | |
| v. | |
| GREGORY P., | |
| Defendant and Appellant. | |

Gregory P., the father of one-year-old Jacob P., appeals from an order of the Sacramento County Juvenile Court denying his modification motion and terminating his

1

parental rights.[1]  (Welf. & Inst. Code, §§ 366.26, 388, 395.)[2]

On appeal, father contends (1) the juvenile court erred by failing to review independently his modification motion seeking placement of Jacob with a paternal great-aunt, and (2) the evidence does not support the court's implied finding that the beneficial relationship exception to adoption was inapplicable.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Originating Circumstances*

At a prenatal appointment in January 2013, mother J.G. tested positive for marijuana and methamphetamine.  At two subsequent prenatal appointments and at Jacob's birth in June 2013, mother tested positive for marijuana.  Hospital staff notified the Sacramento County Department of Health and Human Services (the Department), which took Jacob into protective custody.

Mother told the social worker that she no longer was in a relationship with father, who was " 'on the run' " from law enforcement due to an outstanding warrant related to domestic violence with mother.  A criminal background check confirmed that father had three outstanding warrants for his arrest.

*Petition*

On June 27, 2013, the Department filed a petition alleging that Jacob came within the provisions of section 300, subdivision (b) due to mother's substance abuse and domestic violence with her current boyfriend.  The petition further alleged that Jacob

---

[1]  As the given names of the minor and father are among the 1,000 most popular birth names during the last nine years, we will not designate them by initials, as this impedes readability and results in confusion in legal research and recordkeeping.  (In re *Jennifer O.* (2010) 184 Cal.App.4th 539, 541, fn. 1; see *In re Edward S.* (2009) 173 Cal.App.4th 387, 392, fn. 1; Cal. Rules of Court, rule 8.401(a)(2).)

[2]  Undesignated statutory references are to the Welfare and Institutions Code.

2

came within section 300, subdivision (j) due to mother's failure to reunify with Jacob's sibling, Audrey P. Reunification services in that case were terminated and a guardianship was established with the maternal great-aunt. The petition later was amended in ways that are not pertinent to this appeal.

***Detention***

At the detention hearing on June 28, 2013, the juvenile court ordered Jacob detained and ordered the Department to make a diligent effort to locate father and to conduct home evaluations of relatives who came forward.

***Jurisdiction and Disposition***

When interviewed for the jurisdiction and disposition report, mother indicated that Jacob had two possible fathers. Father contacted the social worker and indicated his desire for a paternity test although he "strongly th[ought]" that Jacob was not his child. Father has a lengthy criminal record and is on felony searchable probation until October 2016.

The report noted that Gregory P. was the father of Audrey and that his reunification services as to Audrey had been terminated. The social worker recommended that father not have contact with Jacob until paternity is established. The social worker also recommended that mother not receive reunification services.

On September 4, 2013, father appeared at a prejurisdictional status hearing. He was taken into custody on the outstanding warrants and counsel was appointed for him.

In an addendum dated September 17, 2013, the social worker reported that a paternity test showed father to be Jacob's biological father. The social worker stated that reunification services for father were not in Jacob's best interest.

3

At a prejurisdictional status hearing on October 9, 2013, father executed a voluntary declaration of paternity. The juvenile court recognized him as the presumed father of Jacob and ordered supervised visitation.

At the contested jurisdiction and disposition hearing on November 25, 2013, the juvenile court amended the section 300, subdivision (j) language to allege that father had been offered reunification services for Audrey; his services were terminated; and a legal guardianship of Audrey was ordered. The court sustained the petition as amended and the matter was continued for a contested disposition hearing.

In an addendum report dated December 20, 2013, the social worker indicated that father had been involved in another dependency case in 2006 that had included domestic violence. Father's reunification services and parental rights had been terminated in 2008. The social worker suggested that reunification services for father were not in Jacob's best interest because Jacob was a newborn who had no relationship with father.

At the contested disposition hearing in February 2014, father testified about the problems that had led to his prior dependency cases. Father testified that he had been able to visit Jacob on two occasions. He believed the visits had gone very well. He was 100 percent committed to proving himself through reunification services.

At the conclusion of the contested hearing, the juvenile court denied reunification services to both parents.

*Selection and Implementation*

In a selection and implementation report dated May 29, 2014, the social worker reported that father had visited Jacob twice in October 2013 and once each in February 2014 and April 2014. Jacob had been with his adoptive family since November 2013 and had "become part of the family."

4

The social worker reported that a kinship social worker had completed an evaluation of the home of S.M., a paternal great-aunt, on December 13, 2013. The home was found to meet state approval and licensing standards on May 6, 2014. As part of the evaluation, S.M. obtained a behavioral evaluation of her pit bull. The test, completed on May 21, 2014, indicated that children would be safe around the dog.

Although S.M. was committed to adopting Jacob, she had never met him. The social worker recommended against placing Jacob with S.M., stating, "Jacob was placed in the current homestudy approved home on November 12, 2013. On November 27, 2013, [S.M.] contacted the previous social worker . . . requesting to be assessed for placement. Jacob has now been placed in the homestudy approved home for six months and he is flourishing in the home. It would be emotionally detrimental to remove Jacob from the home that he has resided in for more than half of his life. He is part of that family and the family is meeting all of his needs."

*Section 388 Petition*

On June 6, 2014, father filed a request to change court order (modification motion) alleging that the "paternal great-aunt came forward shortly after the father was found to be the presumed father of Jacob. She requested placement of Jacob prior to disposition and qualifies under Welfare and Institutions Code Section 361.3 as a relative. As such, *preferential consideration should have been given to her* for placement of Jacob. Unfortunately, it took [the Department] approximately six months to approve her." (Italics added.) The request asserted that placing Jacob with the great-aunt was in his best interest because it "would allow him to bond with and be raised with his biological family. [The great-aunt] has the ability to offer Jacob a connection to his cultural and family identity which will benefit Jacob long term."

*Juvenile Court Ruling*

Exercising its independent judgment, the juvenile court denied the modification motion, stating, "I believe there is changed circumstances, but I also have to find the best interest of the child. In this case the child has lived with the foster parents for almost half his life; and the child at this point has absolutely no connection to the relative, and there is no relative placement at this time of the proceedings." The court stated, "[I]t is a concern how long the Department took to do the kinship. But . . . that's not the issue that I have to determine this afternoon."

The juvenile court then considered the section 366.26 issue. Father objected to the termination of his parental rights. He asked the court to apply the beneficial parental relationship exception to adoption. The court found that Jacob was likely to be adopted and that termination of parental rights would not be detrimental to Jacob. The court terminated both parents' parental rights.

## DISCUSSION

### I. Denial of Father's Section 388 Motion

Father contends the juvenile court erred when it failed to fulfill its mandate under section 361.3 to review independently father's section 388 motion requesting to have Jacob placed with the paternal great-aunt. Father claims the court "mistakenly believed it did not have the legal authority to evaluate the paternal great-aunt as a placement for [Jacob] under section 361.3." Father claims reversal of the order denying the section 388 petition and the order terminating parental rights is necessary in order to "prevent a miscarriage of justice," specifically, in order to give Jacob and his paternal great-aunt "a fair chance to live together, as well as allowing [Jacob] to have a relationship with the rest of his family."

The Department counters that father's contention of harm to the child and the paternal great-aunt is not sufficient to show actual harm to father's own interest; thus,

6

father lacks standing to assert his family members' interest in this appeal. We agree with the Department.

### A. Standing

" 'Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.]' [Citation.] Thus, '[a] parent cannot raise issues on appeal which do not affect his or her own rights.' [Citations.] 'A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement *only if* the placement order's reversal *advances the parent's argument against terminating parental rights.*' " (*In re Jayden M*. (2014) 228 Cal.App.4th 1452, 1459, italics added (*Jayden M*.).)

In this case, father's section 388 petition sought reversal of an adoptive placement with the current caretakers in order to give "a fair chance to" *another adoptive placement*, which would *not* advance an argument *against* terminating his parental rights. Although the "placement of a dependent child with relatives can, under certain circumstances, make the termination of parental rights unnecessary" (*In re K.C*. (2011) 52 Cal.4th 231, 237), those circumstances did not obtain because the paternal great-aunt was seeking to adopt. The record does not suggest, father does not contend, and we will not speculate whether the great-aunt would pursue other options that do not require termination of parental rights if given such an opportunity. (See § 366.26, subd. (c)(1)(A); *In re Esperanza C*. (2008) 165 Cal.App.4th 1042, 1054 [great-uncle and wife were not seeking to adopt; placement would advance an argument against terminating parental rights].) Under our reasoning in *Jayden M*., father has no standing to raise the paternal great-aunt's issue that did not affect his own rights.

Our opinion in *Jayden M*. went on to explain, "Similarly, parents have no standing to appeal based on section 361.3. 'Section 361.3 gives "preferential consideration" to a

7

relative request for placement, which means "that the relative seeking placement shall be the first placement to be considered and investigated." ' [Citations.] Until parental rights are terminated, if the child requires a new placement, any relative who has not been found unsuitable must again receive preferential consideration. [Citations.] Once a parent's reunification services have been terminated, the parent has no standing to appeal relative placement preference issues. [Citation.] Here, the parents' reunification services were terminated. Thereafter, the court heard evidence why the three proposed relative placements (paternal aunt and uncle, maternal grandmother, and paternal grandmother) were not suitable and denied placement with those relatives. Thus, only those relatives could contest the placement denials." (*Jayden M*., *supra*, 228 Cal.App.4th at pp. 1459-1460.)

Father claims this case is distinguishable from *Jayden M*. because he filed a section 388 petition and appealed from its denial. This argument confuses rights or interests with remedies for their violation. Section 388 gave father a remedy to bring his contention before the juvenile court, but it did not create an interest in Jacob's placement that did not otherwise exist.

### *B. Merits*

If father had standing to assert his relative placement claim, we would conclude that it has no merit.

Section 361.3 provides, in relevant part, "(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status. . . . [¶] . . . [¶] (c) For purposes of this section: (1) 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated. [¶] (2) 'Relative' means an adult who is related to the child by blood,

adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution. *However, only the following relatives shall be given preferential consideration for the placement of the child*: *an adult who is a grandparent, aunt, uncle, or sibling*." (Italics added.)

Thus, as this court has noted, "Under the statute, only aunts, uncles, siblings, or grandparents qualify as 'relatives' " entitled to preferential consideration for placement. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 680.) Because the great-aunt was not entitled to preferential consideration, i.e., to be "the first placement to be considered and investigated" (§ 361.3, subd. (c)(1)), the Department was entitled to *first* consider and investigate the present caretakers. Father's argument that the great-aunt "should have been provided with preferential consideration throughout the proceedings" has no merit.

As it turned out, that first evaluation of the caretakers ripened into a successful placement by the time of the section 388 motion. Under those circumstances, the juvenile court was entitled to find that disrupting the placement was not in Jacob's best interest. That is so regardless of whether the great-aunt should have been evaluated in a more prompt, albeit not preferential, manner.

This leaves father's claim that the juvenile court "mistakenly believed it did not have the legal authority to evaluate the paternal great-aunt as a placement for [Jacob] under section 361.3." The court's remarks do not support this claim.

The remark that "whether kinship was appropriately done as quickly as possible or not" was "not the issue that [the court has] to determine" reflects the juvenile court's understanding that error with respect to the timeliness of the evaluation would not justify disrupting an existing placement that was in the child's best interest. The remark does

9

not reflect a belief that the court lacked authority; it reflects a belief that authority should be used to promote the best interest of the child.

The remarks the juvenile court addressed to the paternal great-aunt, that it "only can do what the law requires" and that its ruling was "the best [it] can do by following the law as [the court understood it]," similarly do not reflect a belief that the court lacked power to consider the issue of placement with the great-aunt; they simply reflect a belief that the law requires the court to act in the child's best interest. There was no error.

## II. Substantial Evidence re Termination of Parental Rights

Father contends substantial evidence did not support the juvenile court's decision to terminate parental rights. He argues "[t]here did not appear to be any evidence to controvert father's position that the beneficial parent-child exception applied to prevent termination of parental rights." We disagree.

### A. Background

Father resided in Los Angeles County. Jacob was born in Sacramento County and was placed in protective custody at birth in June 2013.

Father initially denied paternity, and the Department recommended that he have no contact with Jacob until paternity was established.

Laboratory tests were performed in August 2013, and father executed a voluntary declaration of paternity in October 2013, at which point the juvenile court recognized him as the presumed father of Jacob.

Father had supervised visits with Jacob on five occasions: twice in October 2013, once in December 2013, once in February 2014, and once in April 2014. A visit was being arranged for June 2014.

10

### B. Relevant Legal Principles

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373; Cal. Rules of Court, rule 5.725(d)(4); Evid. Code, § 500.)

The primary exceptions, i.e., benefit from continued contact with the parent and interference with a sibling relationship, each require the party to establish a factual predicate and the court to weigh the evidence. Substantial evidence must support the factual predicate of the exception, but the court exercises its discretion in the weighing process. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

Termination of parental rights may be detrimental to the minor when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) However, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child

11

would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive, emotional attachment between parent and child. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728-729; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

The requisite showing for the beneficial parental relationship exception "will be difficult to make in the situation, such as the one here, where the parent[] . . . never had custody of the child nor advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

### *C. Analysis*

Father contends it "was detrimental to [Jacob] to terminate parental rights because father maintained the visitation he was allowed to have and [Jacob] would benefit from continuing the relationship with his father." Specifically, father argues that he had no visitation for the first four months of Jacob's life, until he was found to be the presumed father in October 2013; father "appeared to be committed to attending the scheduled visitation he was allowed to have"; and the Department never reported that father had missed a visit or was inappropriate during a visit (except when he and mother brought Jacob an inappropriate item of food).

But "[t]here was no evidence before the court that the positive contact outweighed the security and sense of belonging available in an adoptive home or that [Jacob] would be greatly harmed if the positive relationship were terminated." (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.) Because father never had custody or advanced beyond supervised visitation, he is unable to make the difficult but requisite showing for the beneficial parental relationship exception. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) The order terminating parental rights is supported by substantial evidence and

12

was not an abuse of discretion.  (*In re Bailey J*., *supra*, 189 Cal.App.4th at pp. 1314-1315.)

## DISPOSITION

The order denying the modification motion and terminating father's parental rights is affirmed.

                                                                             BUTZ            , J.

We concur:

       BLEASE         , Acting P. J.

       NICHOLSON    , J.