Filed 6/6/13  In re Abraama M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ABRAAMA M. et al., Persons Coming Under the Juvenile Court Law. | B241627 (Los Angeles County Super. Ct. No. CK75650) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. BRIAN C. et al., Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Joseph D. MacKenzie, under appointment by the Court of Appeal, for Defendant and Appellant Brian C.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant Abra M.

Amir Pichvai for Plaintiff and Respondent.

_____

Abra M. (Mother) and Brian C. appeal from dependency court orders (1) finding that they received reasonable reunification services and (2) terminating their parental rights to their two children. Mother contends that she has visited regularly and the children would benefit from continuing their family and sibling relationships. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), (v).)[1] Brian C. joins in Mother's sibling relationship claim. We find no error and affirm.

## FACTS[2]

As detailed in prior opinions in this case, which encompassed 12 appeals and many child abuse referrals, this family has a long history of involvement with the juvenile court and the Department of Children of Family Services (DCFS), spanning several generations. One of the prior appeals involved the maternal grandparents, Frank and O. M., who have six children (including Mother), many of whom were juvenile court dependents. The extended family lives together in a violent, chaotic and dirty home environment. The grandparents and their children have been confrontational and uncooperative with DCFS and law enforcement agencies.

Mother has four children: Abraama (born in 2003); Abigail (2007); Amansha (2010); and J. (2011).[3] Appellant Brian C. is the father of Abigail and Amansha. James S. is the father of Abraama.

Abraama and Abigail were detained in December 2008. In April 2009, Mother engaged in physical altercations with two DCFS monitors, causing injuries to both. The

---

**1** All undesignated statutory references are to the Welfare and Institutions Code.

**2** Some of the factual history recited in this opinion is derived from this Court's prior opinions in *In re Abrama M.* (Feb. 1, 2011, B216673) (nonpub. opn.); *In re Abrama M.* (Oct. 3, 2011, B229236) (nonpub. opn.); and *In re Abrama M.* (Oct. 2, 2012, B235048) (nonpub. opn.). The facts and law in the cited opinions are res judicata.

**3** There is some confusion in the record about the spelling of the children's names. We are using the spellings from the reporter's transcript. With respect to Amansha, the trial court pronounced and spelled her name from her birth certificate at the hearing on May 17, 2012. This is the best evidence available.

juvenile court issued a restraining order against Mother, who was no longer allowed to have visits at the DCFS office. An amended petition was sustained in July 2009 as follows: on numerous occasions Mother physically abused Abraama and other children in the family home, pinching one of them (leaving marks and bruises) and by striking another with her hands on the face and body; Abraama and Abigail were exposed to violent altercations in the home; the children's maternal uncle Nathaniel sexually abused their minor female cousin in the home and Mother failed to protect Abraama and Abigail by allowing Nathaniel to continue residing with them.

In September 2009, DCFS filed a petition alleging that Brian C. has a substantial criminal history that endangers Abigail and places her at risk of harm. As amended, the petition was sustained on November 5, 2009.

The juvenile court placed Abraama and Abigail with Abraama's biological father, James S., over Mother's objection that he engaged in domestic violence in the past. The court granted James S. legal and physical custody of Abraama and terminated its jurisdiction over her. Abigail remained a dependent of the court. Mother and Brian C. were ordered to participate in reunification services, including parenting classes, individual counseling, anger management, and a psychiatric assessment. Mother's challenges to the disposition orders did not succeed. (*In re Abrama M.*, *supra*, B216673.)

In May 2010, DCFS filed a supplemental petition on behalf of Abigail and Abraama pertaining to physically abusive behavior and domestic violence by James S. Two months later, a petition was filed on behalf of Mother's newborn girl Amansha, arising from the harm to her siblings; the court ordered that the baby be detained. At a jurisdiction hearing in August 2010, the court sustained allegations of inappropriate discipline of Abraama by James S. One month later, the court found that Brian C. is not in compliance with the case plan and terminated his reunification services.

In October 2010, DCFS reported that Abraama and her sisters were repeatedly removed from foster homes due to Mother's false calls to a child abuse hotline. Abraama was defecating on herself and smearing feces on walls and floors as a reaction to being constantly removed from her placements. When informed of the problem, Mother replied

3

that she would continue to call the hotline and make complaints until the children were returned to her care. Mother refused to recognize that her behavior was traumatizing the children. The social worker was unable to find a placement for Abraama and Abigail in one home after Mother's most recent hotline complaints, so they had to be separated.

After Mother made 10 unfounded complaints to the hotline, Abraama's therapist opined that the six-year-old was "so emotionally dysregulated" that she could "barely articulate thoughts or feelings of any kind" and the child expressed fear of Mother. The therapist was alarmed at the frequent disruptions caused by Mother's behavior, noting that the child "has symptoms consistent with trauma such as flat affect, dissociation, hypervigilance, extreme startle response, agitation, inability to recall/articulate events/memories, sleep disturbances and poor concentration, as well as encopresis, and these symptoms cause severe impairment at home or school." The therapist warned that the symptoms could worsen.

On October 18, 2010, the court declared Abraama a dependent and found that leaving her in the parental home presented a substantial danger to her physical or emotional well-being. She was placed in the custody and care of DCFS. The court authorized monitored visits and ordered Mother to participate in individual counseling with a licensed therapist to address anger management and other case issues. Mother appealed the disposition order. We affirmed, finding substantial evidence to support the juvenile court's conclusion that placing Abraama with Mother would be detrimental. We cited Mother's harmful interruptions to Abraama's life by making false calls to a child abuse hotline plus the concerns of Abraama's therapist. Mother voiced an intent to continue her destructive behavior, without understanding that the behavior prevented the court from returning Abraama to her. Although Mother participated in anger management and counseling programs, and was visiting the children, Mother did not make substantive progress because she was unable to control her anger and her visits demonstrated inadequate parenting skills. (*In re Abrama M.*, *supra*, B229236.)

In January 2011, the juvenile court sustained the petition relating to Amansha. That month, Mother indicated that she was on waiting lists for individual counseling

4

services and was attending a program called "New You" but had not been assigned a therapist there. Mother's rage at DCFS was an obstacle in completing services. DCFS told Mother in February 2011 that openings were available at an approved service provider, but Mother responded that it was too far away. Mother was attending an outpatient drug program at New You. DCFS advised the director of New You that Mother had to see a licensed therapist, but was unable to confirm in March 2011 that she was receiving proper counseling. In April 2011, Mother and Brian C. had an altercation that resulted in Brian C.'s arrest.

In May 2011, Mother filed a petition for modification seeking unmonitored visitation with her three daughters. She provided certificates showing completion of "anger management" and "individual sessions"; however, DCFS was unable to confirm that Mother had obtained treatment from a licensed therapist at New You, and Mother declined DCFS's attempts to provide her with additional referrals.

At a hearing on June 21, 2011, the court questioned Mother's credibility and found that she had not fully complied with court orders, describing her as "still incapable, after more than three years, of accepting **any** responsibility for her children." It denied her petition for a modification because circumstances were "changing," not "changed." The court rejected Mother's claim that DCFS failed to provide her with reasonable services, finding that "[t]he record is more than clear that reasonable services were provided." Nevertheless, the court granted Mother another 12 months of reunification services with Abraama. As to Abigail, the court declined to proceed with the termination of parental rights because DCFS had not located an adoptive home. Mother and Brian C. were denied reunification services with Amansha because her young age and their failure to convince the court that it would be in her best interests. The court scheduled Amansha's permanency planning hearing for November 2011.

After Mother appealed from the June 21, 2011 order, this Court concluded that DCFS provided her with reasonable services by giving her referrals to licensed therapists, including low-cost and no-cost therapists, which Mother acknowledged receiving in October 2010. In February 2011, DCFS advised Mother about openings at a licensed

5

facility, but she declined the opportunity. On May 12, 2011, the social worker attempted to provide Mother with additional referrals, but Mother rejected the information, saying that she would get it from her attorney. At the June 2011 hearing, the social worker testified that Mother never requested additional counseling referrals or indicated that she was having difficulty finding a licensed therapist. Mother's testimony to the contrary was rejected by the trial court for lack of credibility. (*In re Abrama M.*, *supra*, B235048.)

We now move to events occurring since the June 21, 2011 order. In a July 2011 status review report, DCFS noted that Mother was ordered in November 2009 to complete parenting education and anger management: she has thus far failed to provide verification of completion, continues to suffer from anger management issues, and was not in counseling with a licensed therapist. She was verbally aggressive with the caseworker, yelling and using profanity to express frustration. DCFS recommended that Mother's reunification services be terminated. The foster caregiver for Abigail and Abraama described them as "a joy to have." Abigail has difficulty speaking as a result of anxiety issues, but is in "her comfort zone" at the caregiver's home, where she eats and sleeps well and feels safe. The caregiver expressed interest in a guardianship.

During the July 2011 review hearing, Mother complained that she was not receiving adequate visitation, but DCFS pointed out that Mother failed to call and confirm her visits, so DCFS did not arrange to transport the children. The court ordered two visits per week, and directed Mother to confirm the visits in advance. The court commented that the social worker was working "diligently" to arrange counseling for Mother with a licensed therapist. At a follow-up hearing, Mother's attorney represented the she will "be enrolled very soon in therapy."

In August 2011, DCFS reported that Mother was having two weekly visits with her daughters. She had just given birth to J., who was in her care, although a child abuse referral was generated four days after birth alleging that Mother and Brian C. were involved in ongoing domestic violence; Mother failed to inform DCFS that she gave birth; and Mother "stated that she wanted to have 'Brian killed.'" Mother was residing in transitional housing at New You.

6

A September 2011 report indicated that Ms. E., the foster caregiver for Abraama and Abigail, wished to adopt both children: she has cared for them since October 2010, has developed a bond with them, and they refer to her as "mommy." A long-time government employee, Ms. E. feels capable of providing the girls with a permanent home. She pays for a private preschool for Abigail.

In October 2011, the director of New You wrote to say that its relationship with Mother had terminated: Mother became offended when asked to clean up her spot in transitional housing, failed to keep counseling appointments, and felt her children were unwelcome at New You. New You certified that Mother completed seven months of anger management and parenting skills education with counseling. DCFS requested greater detail on Mother's programs and her progress in therapy.

Abraama and Abigail continued to reside with their foster mother Ms. E., who provides them with their educational, medical and emotional needs. Mother was having consistent monitored visits with the children two times per week for three hours per session. Mother helps with the children's hair and homework, and there were no problems during the visits. Abraama has a close bond with Mother and is always excited about her visits. She likes Brian C. (who is not her father) and occasionally calls him "daddy." Mother and Brian C. were recently investigated for domestic violence, and a new referral was received in October 2011 alleging that newborn J. was living in squalor with Mother, Brian C., and the maternal grandparents. That complaint was being investigated. DCFS was unwilling to liberalize Mother's visits because it was unclear whether Mother has made progress addressing her anger management issues, plus she is not living in a safe place. It asked the court to terminate reunification services.

Amansha (age 14 months) was placed in foster care, and was visited by Mother and Brian C. twice a week, along with her siblings. There were no concerns about the parental visits. A prospective adoptive parent had been found for Amansha. Ms. E. now wished to adopt Abigail, but not Abraama. DCFS identified a home where they could be adopted together, that was in close proximity to Amansha's prospective adoptive family.

7

Abraama's therapist opined that the child's attachment to Mother "is based on manipulation" and Mother "encourages Abraama to not follow rules." The therapist "has observed that Abraama's symptoms increase when she has a lot of contact with her birth mother" and her "prognosis is 'so bad' if she continues her relationship with her mother." Despite Abraama's attachment to Mother, ending their relationship was the child's "best chance" for recovery.

Mother visited the children consistently, brought food for them, and interacted well with them. Abraama and Mother genuinely care for each other, and Abraama always hugs and kisses Mother during the visits. Abigail was somewhat "standoffish" with Mother and her siblings, needing time to warm up during the visits. By the end of a visit, she is more engaged. She is less affectionate toward Mother. Amansha is a very happy child who is open and friendly towards anyone. She seems to recognize Mother and shows no fear of her. They exchange hugs and kisses during visits. Brian C. participated in some visits, but is not consistent. Abraama is close to him, but does not want to see her birth father, James S. On October 20, 2011, Mother was referred to an organization that provides transitional housing. As of mid-January 2012, Mother had telephoned the organization and promised to begin the application process, but had not appeared there to do so. Mother was living with J. in the homes of friends and relatives, but would not allow DCFS to inspect her residences.

DCFS noted that Abraama and Abigail have lived together since December 2008, and adoption was still the recommended plan for them, despite Abraama's attachment to Mother. Mother's false allegations of child abuse has caused the children to suffer from instability. DCFS could not hope to place the girls together in an adoptive home until Mother's visits were terminated, so that she could not "sabotage and jeopardize" the adoption. Adoption plans were proceeding for Amansha.

Mother petitioned for a modification in November 2011. She listed as changed circumstances her completion of parenting and counseling, and improved anger management, coping and parenting skills, and decision making. She accepts responsibility for losing custody of the children, noting that they have a strong emotional

8

bond with her. She requested: six months of reunification services with Abigail and Amansha; custody of Abigail and Abraama in an assisted living program; and unmonitored visits. Visitation notes from July to September 2011 indicate that Mother ate with the children during visits; interacted well with them; is attentive; offers praise and encouragement; helped with homework and hair styling; and the children looked forward to seeing her. The court set a hearing on Mother's petition.

At a hearing in January 2012, DCFS social worker Jeffrey Grant testified that Mother appears to be sober and he has not observed a drug abuse problem since he was assigned to her case in August 2011. He considers Mother to be in compliance with the case plan. On cross-examination, Grant conceded that Mother did not receive counseling from a licensed therapist and, therefore, was not in compliance with the case plan. New You scheduled Mother for a session with a licensed therapist, but Mother failed to arrive for it. Mother has not had any recent angry outbursts with DCFS; however, she was ejected from transitional housing because she did not feel that she had to keep her space clean. Mother visits the children regularly. The visits are appropriate, and she interacts well with the children, especially Abraama. Abraama is upset when the visits end and expressed a desire to go home with Mother. There is a positive and affectionate bond between them. Abigail takes time to warm up to Mother during visits and there is a bond "usually towards the end of visits." Amansha is also affectionate toward Mother.

Grant was not able to assess Mother's current living situation. When he shows up to examine her residence, no one is there to let him inside. He referred her to a housing agency in October 2011, but she has not brought the appropriate paperwork to the agency though she promised to do so multiple times. Abraama lives with Abigail and recognizes that Amansha is her sister. The siblings are affectionate, enjoy each other's company, and are bonded.

The DCFS recommendation was to terminate reunification services for Abraama and set a permanent plan hearing. Though Grant does not believe that Mother would physically harm the children, "[i]t wouldn't be practical for us to recommend unmonitored visitation and just give her the children [because] we don't know where

9

she's staying or where she's residing." Without knowing Mother's living situation, DCFS does not know if the children would be safe with her.

The program director from New You testified that she counseled Mother, but is not a licensed therapist. Her program specializes in substance abuse rehabilitation. Though the director was aware of the court order that Mother be treated by a licensed therapist, Mother did not receive such treatment. New You arranged for Mother to see a licensed therapist: Mother missed the appointment with the therapist, but came to New You to have a visit with her children. The appointment was not rescheduled because Mother was discharged from New You.

The program director expressed concern that Mother has difficulty staying focused, and continues to be attached to her parents and siblings. Mother left New You because she was "offended" at being asked to keep her space clean and felt her children were unwelcome. Mother was angry at the way that her dependency case was handled, but she now has a better approach, does not interact in a combative manner, and listens without arguing. Mother tries to respond to her children's needs and used the kitchen at New You to prepare food for them.

Mother testified that she did not move into "Beyond Shelter" housing, despite referrals from the DCFS social worker. Instead, she lives in the homes of friends and relatives, and has been on a waiting list for Section 8 housing since 2003. DCFS has not seen the places where she has been living with J. She is rushing to locate stable housing so that she can be reunited with her children. Mother claimed to be unaware that she needed counseling from a licensed therapist. She feels the counseling at New You was sufficient and does not understand why "everything I do, it seems like it's not good enough."

In April 2012, DCFS reported that Mother has not enrolled in a counseling program with a licensed therapist. Brian C. has not completed any court-ordered case plan requirements. Mother and Brian C. have weekly monitored visits with the children, bringing food and gifts. There were no problems or incidents during visits. Abraama was excited about the visits, Abigail was less excited but sometimes cries when the visits

10

end.  Amansha shows no interest in the visits as she is very young, but enjoys interacting with her family.  Mother has not provided DCFS with an address to assess her current residence, and is still looking for appropriate housing.  Mother continues to deny that any child abuse occurred while she was living in her parents' home, which is the problem that led to this dependency case.

Abraama was involved in an incident in which she demanded that a schoolmate remove her clothing and kiss her; when the girl refused, Abraama attempted to strangle her.  Abraama was suspended from school and referred to a mental health program for children.  Abraama acts in an "unusual" way in the foster home with her sister Abigail, and they had to be placed in separate bedrooms.  Abraama was questioned about her behavior and said, "I can't help it."  DCFS continued to recommend that parental rights to Amansha and Abigail be terminated for Mother and Brian C., and that Mother's reunification services with Abraama be terminated.  The foster mother was interested in adopting Abigail, but not Abraama.

DCFS informed the court that Brian C. attended a monitored visit with Mother on April 19.  They both seemed upset, and began discussing the dependency case with the children.  Brian C. became angry, paced the floor, punched his fist and used profanity.  When warned that his behavior could cause the visit to be terminated, Brian C. said, "I'm going to kill that nigger, CSW Social Worker and I will take everybody else out too," referring to DCFS social worker Grant.  As the visit ended, Brian C. confronted Grant outside the foster agency, demanded the confidential address of Amansha's caregiver, and repeatedly threatened to kill Grant and as many others as possible if his children were not returned to him, adding that he had no problem doing the prison time if necessary.  Grant felt very unsafe during this incident.  He concluded that "the risk level is very high and it would be detrimental to place these children back in the care and custody" of Mother and Brian C because "the visits have become very volatile and could lead to bodily injury."  He recommended that visits be terminated.

Brian C. testified that he was calm when he arrived, and he and Mother did not discuss the case in front of the children.  He became upset when he saw Amansha kiss

DCFS employee Grant on the mouth, feeling that she has displayed sexually inappropriate behavior and was "staying with" Grant or someone close to him. He asked someone to call the police, but denied pacing the floor, punching his fist, or using profanity. He denied threatening to kill Grant and others.

Mother testified that she and Brian C. did not discuss the case in front of the children, although she encouraged Abraama to write complaint letters about the foster mother. Mother was shocked to see Amansha kiss the social worker on the mouth, raised her voice, and grabbed the child away from him. Mother denied that Brian C. used profanity or made threats against Grant or others. Mother called the child abuse hotline twice to report the social worker's alleged misconduct during the April 19 visit and Abraama's alleged mistreatment in foster care. Mother stated that she has been living with various family members, but denies living with her parents.

DCFS worker Grant testified that everything he described in his report was true. Brian C. repeatedly threatened to kill him and others. Grant has monitored the parents' visits two times a week since August 2011. He denied that Amansha kissed him on the lips. He did not call the police when Brian C. threatened to kill him, though he was concerned for his safety. Brian C. made no references to improper behavior, so Grant did not know what caused his outburst; however, Brian C. expressed anger at the contents of Grant's reports, calling them disrespectful.

The court issued a written decision on May 17, 2012. It wrote, "Not only has mother not progressed, she has regressed. [Brian C.] has not complied at all." Further, their "credibility is nil." It was clear that Mother "lacks all impulse control." In April 2011, Mother and Brian C. were involved in a violent incident, and she obtained a restraining order because she felt threatened by him and has to look behind her when she walks down the street. Brian C.'s attack caused Mother to miscarry. Soon after, Mother invited him to live with her, and became pregnant by him. All of this calls into question Mother's credibility, and "leads the court to conclude that [Mother] is still incapable, after more than three years, of accepting **any** responsibility for her children being subject to the court's jurisdiction."

12

The court wrote that Mother continues to report child abuse to a hotline, despite a history of making false allegations and disrupting the children's placements. Her impulsivity is demonstrated by her inability to establish a safe residence, by lashing out at people who are trying to assist her; by leaving transitional housing because she was told to clean up her room; and by filing ex parte documents. Brian C. attacked the DCFS social worker after receiving his report to the court, and Mother was "a willing participant." The court found their accusations that the social worker engaged in improper behavior in front of the parents and other workers at the agency to be incredible and unbelievable.

Mother failed to show a change of circumstances: it is "patently obvious" that she has regressed, not progressed. Further, it appears that she is residing with Brian C., is not being honest about her living situation, and her plans are "illusory." The court denied Mother's petition for a modification. It terminated Mother's reunification services with Abraama because Mother "cannot control herself" and "her inability to control her impulses would put these children at risk if they were returned to her." The court found that Mother has had more than 18 months of services and has failed to completely comply with the case plan or make substantive progress. It limited Mother to one visit with Abraama per month, in the DCFS office.

Finally, the court terminated parental rights as to Abigail and Amansha, finding no applicable exception to the legislative preference for adoption once reunification services have proved unsuccessful. The parents have not progressed beyond monitored visitation and they have not shown any real parenting skills other than providing food during visits, as any relative or friend would do. The parental relationship does not outweigh the benefit to the children of a permanent home. The children are adoptable. While Abigail and Abraama live together, neither parent (nor the children's counsel) showed that their relationship outweighs the permanence of adoption. Abigail's foster mother wishes to adopt her, and there is every hope that Abraama can be placed with her paternal grandmother or returned to her natural father.

13

## DISCUSSION

When reviewing an order that (1) finds reasonable reunification services were provided and (2) terminates parental rights, we determine if substantial evidence supports the conclusions of the dependency court. All conflicts are resolved in favor of the prevailing party and all legitimate inferences are drawn to uphold the lower court's ruling. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378-1379.) We cannot reweigh the evidence or substitute our judgment for that of the trial court. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

### 1. Termination of Mother's Reunification Services with Abraama

Mother renews her argument that she was not provided with adequate referrals to a licensed therapist. She previously made this argument in her most recent appeal in B235048. In our opinion, we wrote that DCFS provided Mother with reasonable services by giving her referrals to licensed therapists, including low-cost and no-cost therapists in 2010. DCFS referred Mother to openings at a licensed facility in February 2011, but she declined the opportunity. Mother's claims to the contrary were not credible.

Reunification services should be tailored to the needs of the family, but need not be perfect. (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) Services are reasonable if DCFS has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult," such as providing transportation. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.)

Mother has not availed herself of referrals offered to her by DCFS since the outset of this case in 2008. After the last appeal was filed, Mother's attorney informed the court that a suitable therapist had been located and Mother would enroll in therapy "very

14

soon." An appointment with a therapist was arranged for October 2011, but Mother failed to appear, citing family obligations, although she arrived in time to have a visit with the children. Mother filed a section 388 petition in November 2011, requesting six more months of services to complete the case plan. Mother's petition was denied in May 2012. During the six-month interval between the filing of the petition and its resolution, Mother continued to receive reunification services, yet failed to complete the case plan.

Mother had three and one-half years to complete her counseling requirement, and was given repeated opportunities to comply. She received help from the DCFS social worker and her attorney's office. She declined referrals, then failed to show up when an appointment was scheduled.

The problem is not that Mother lacked sufficient services; rather, the problem is that she does not want to comply. As she testified, "everything I do it seems like it's not good enough. And everybody's just emphasized on a licensed therapist. And I just feel kind of like it's biased because of all of the counseling that I have received. . . . I was getting, you know, general counseling through the New You. . . . And I thought that was sufficient enough." Mother knew she was at a critical juncture in her case, yet she still resisted additional counseling. Adding six more months of services after Mother received three and a half years of services would not have made a difference, in light of her attitude that she has had enough counseling. Under the circumstances, there is sufficient evidence to support the dependency court's finding that Mother received reasonable services over the lengthy course of this proceeding.

## 2. **Termination of Parental Rights to Abigail and Amansha**

At the selection and implementation hearing, the court must select adoption as the permanent plan and terminate parental rights if it finds that the child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re Jamie R.*, *supra*, 90 Cal.App.4th at p. 773.) Adoption is the permanent plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44

Cal.App.4th 1352, 1368.)[4]  A parent may avoid termination of parental rights by showing that it would be detrimental to the child.  (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

a.  "*Benefit to the Child" Exception*

Mother argues that termination of parental rights would be detrimental because she has "maintained regular visitation and contact" with the children, who "would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  Mother must show why the statutory exception applies, and that termination would be detrimental to the child. (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  She carries the burden of proving that the children would be "greatly" harmed by termination of parental rights, and that she holds a "parental" role.  (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466-468.)

Mother must show both prongs of the exception:  regular visitation and a benefit to the children if the relationship were continued that outweighs the well-being the children would gain in a new home with adoptive parents.  As to the first prong, Mother's visits have been consistent.  As to the second prong, the dependency court determined that the children's relationship with Mother is not so substantial that they would be greatly harmed if it were severed.

This dependency case began in December 2008, when Abigail was one year old and two years before Amansha was born.  Parental rights were terminated in May 2012. For the entire three and one-half years, Mother never participated in counseling with a licensed therapist to address her anger and impulse control issues.  The results are telling.

During the dependency proceeding, Mother (1) assaulted two DCFS employees, causing them injury; (2) was under a restraining order to stay away from the DCFS office; (3) made countless false calls to a child abuse hotline, traumatizing her children by causing them to be moved from place to place; (4) left her transitional housing program because she was angry at being asked to clean her room; (5) threatened to have

---

[4]    Mother and Brian C. do not dispute that the children are likely to be adopted.

Brian C. killed; and (6) recently accused a DCFS social worker of having a sexual relationship with two-year-old Amansha. Despite this track record, Mother testified that the assistance she received from the unlicensed counselor at New You was sufficient for her needs. As the juvenile court found, Mother did not progress over the course of the dependency proceeding; rather, she regressed.

As a result of Mother's defiant and uncooperative attitude, she was unable to have unmonitored, weekend or extended visits, let alone custody of the children. A showing that a child would be greatly harmed by termination of parental rights is difficult to make when, as here, "the parents have . . . [not] advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) A true parental relationship would not require a third party to monitor parent-child visits.

Mother's visits were never liberalized because she failed to address the domestic violence and anger management problems that lead to dependency jurisdiction. The trial court firmly believed that Mother and Brian C. live together, despite Brian C.'s propensity for violence. Their credibility is "nil": their claim that they live apart is untrue. Unsurprisingly, the court did not see any benefit to the children of maintaining a relationship with a father who battered their mother and voiced his intent to kill a social worker and as many people as possible, and his willingness to do the resulting prison time.

Mother argues that she has consistently visited the children, the visits were positive and appropriate, the children expressed love for her, and they were sorry when visits ended. Even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Mother does not occupy a parental role and is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) While the children are bonding with their prospective adoptive parents, Mother has not progressed to the point where she can have unmonitored or overnight visits, even if the visits are enjoyable for Mother and the children. A relationship that is "pleasant" is not enough to establish a benefit to the child because "it

bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Here, the children looked forward to their monitored visits with Mother as they might look forward to a play date. Mother brought food, styled the girls' hair, and they had fun together.

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) Abigail and Amansha were very young when they were detained: Abigail was born in 2007 and detained in 2008, and Amansha was detained when she was one month old. They are too young to remember living with Mother, and only know her from weekly visits. Mother does not occupy a parental role for either child.

Mother does not dispute that the children are thriving in their placements. Unfortunately, she caused instability in her children's lives by repeatedly making false calls to a child abuse hotline, sabotaging their placements and causing trauma. Right to the end, she continued to telephone the hotline and complain, showing no insight into the circumstances that led to this dependency proceeding. Mother did not carry her burden of showing that the children would be greatly harmed by the termination of her parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home. Under the circumstances, the juvenile court could reasonably find that Mother's relationship was not beneficial to the children. In a guardianship or continued foster care, the children would suffer from unstable placements while Mother continued to maliciously create problems for their caregivers. Where, as here, the children are likely to be adopted, the court must choose adoption over a guardianship to give them "the most permanent and secure alternative that can be afforded them." (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.)

### b. *The "Sibling Relationship" Exception*

Parental rights should not be terminated if it would cause a "substantial interference with a child's sibling relationship," taking into consideration whether the siblings were raised in the same home; share "significant common experiences or [ ] existing close and strong bonds," and maintaining ongoing contact is in their best long-term emotional interest, as compared to the benefit of legal permanence through adoption. (§ 366.26, subd. (c)(1)(B)(v).) Establishing this exception imposes a heavy burden on the parent opposing adoption. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 61.)

"The court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) "[T]he parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationships with each other, but would not suffer detriment if that relationship ended." (*Id.* at p. 952, fn. omitted.)

Mother asserts that the children must be kept together because they have the same parents and have visited together. She blames DCFS for failing to lodge the girls together in one foster placement. The record shows, in contrast to Mother's claims, that Mother sabotaged the children's placements by repeatedly making false claims of child abuse to a hotline. Multiple caregivers expressed interest in adopting the children, only to become targets of Mother's false child abuse claims.

The dependency court found no merit to Mother's claim of a significant sibling relationship. Amansha lived with Abraama and Abigail briefly, shortly after her birth. She does not share significant common experiences with her siblings. (See *In re Celine R.*, *supra*, 31 Cal.4th at p. 61.) Amansha is very friendly to everyone. The record shows that she has no particular interest in family visits; it is a "playful atmosphere."

Abigail and Abraama lived together for a period of time—until Mother's incessant interference frightened off the caregivers. Abraama attacked a schoolmate and acted strangely with Abigail, so that they had to be placed in separate bedrooms. Abraama's

19

therapist opined that Mother's manipulation was the root cause of the child's behavioral problems and poor prognosis. The caregiver that the children bonded with and called "mommy" no longer wished to adopt Abraama. Had Mother not sabotaged the children's placements, they might have been adopted together and Abigail might not be suffering the trauma and depression that Brian C. describes in his brief, from having lived in seven different homes in the first three years of her life.

It is not clear from the record that the children would be greatly harmed by the loss of a sibling relationship if parental rights are terminated. It is clear that the children need permanent homes, safe from Mother's manipulations. As documented by the social worker, the girls are happy to see each other during visits. Yet there is no evidence from a psychologist suggesting that they would be greatly harmed if permanently separated; there is no evidence of any behavioral issues arising from the siblings' separation; and there is no evidence that they ask their caregivers to see their siblings between visits. Given the young ages of Amansha and Abigail, the stability of a permanent home outweighs the benefits of their sibling relationship. The legislative presumption favors adoption. Neither parent bore the burden of proving otherwise.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.                              FERNS, J.*


_____


*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


20