Filed 9/5/14  In re Lorenzo M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LORENZO M., a Person Coming Under the Juvenile Court Law. | B254768 (Los Angeles County Super. Ct. No. CK64165) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ELSA M., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Marilyn K. Martinez, Juvenile Court Referee.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, Limberly A. Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court terminated the parental rights of Elsa M. (Mother), finding that the parent-child relationship exception does not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] This is the second dependency proceeding involving her son Lorenzo. After undergoing drug rehabilitation in the first proceeding, Mother resumed using illegal drugs and was arrested for child endangerment. Mother failed to carry her burden of proving that Lorenzo would be greatly harmed by the termination of parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home. We affirm.

## FACTS

Mother is the parent of Lorenzo M., born in 2004.[2] Mother came to the attention of the Department of Children and Family Services (DCFS) in 2006, when she was transient, using drugs, and was seen having a physical altercation while holding Lorenzo. Police found Mother passed out drunk in a parking lot after midnight, while Lorenzo ran in and out of traffic on a nearby street. Mother was arrested for child neglect and the juvenile court asserted dependency jurisdiction over Lorenzo. Mother participated in reunification services, including a drug treatment program, counseling, parenting, and random drug and alcohol testing. Lorenzo was returned to Mother's custody in 2007, and the case was closed in 2008.

In 2012, Mother reported that she was homeless and was the victim of domestic violence by Gabriel's father, G.R., who hit her with a forearm to the throat and left bruises on her chin. Mother said that Lorenzo was with a relative, who refused to return the boy to Mother. A safety plan was implemented to put Mother and the children in a domestic violence shelter.

In January 2013, Mother was arrested for child endangerment and for being under the influence of methamphetamine (meth). Neither Gabriel (age six months) nor Lorenzo

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

[2] Mother's son Gabriel, born in 2012, is not involved in this appeal.

(age eight) was properly clothed, and the home was filthy with dog feces and cockroaches, lacking a refrigerator or stove. Mother told police that she took meth a few hours before her arrest, and has used the drug three times per week for the past year. Her children were taken into protective custody.

Lorenzo told the social worker that Mother and G.R. "punch, push and fight . . . kick each other's butts and it makes him sad and scared." G.R. admitted to smoking meth the day that he and Mother were arrested. He and Mother sometimes slap each other, but he does not consider it "real fighting." He is on parole for felony carjacking. The whereabouts of Lorenzo's father are unknown: he did not participate in the prior dependency proceeding, does not provide Lorenzo with the necessities of life, and has never been part of Lorenzo's life.

Mother admitted to using "'a little meth'" but insisted that she is a good mother. She showed signs of being under the influence, with rapid and erratic speech. She denied physical arguments, denied having a criminal history, and denied mental health issues that required treatment. She characterized reports of domestic violence as lies from her relatives. Records show a criminal history dating back to 1993.

A dependency petition was filed in Riverside County on behalf of Lorenzo and Gabriel, alleging a failure to protect and failure to provide support. At a hearing on January 17, 2013, Mother denied the allegations in the petition. The court found a prima facie case for detaining the children. Mother was ordered to attend parenting education, substance abuse treatment, counseling, and to submit to drug and alcohol testing. She was authorized to have monitored visitation.

In an interview for the jurisdiction/disposition report, Mother said, "I don't abuse meth, I took one hit that night that is it." Mother denied physical altercations with G.R. She admitted to having a criminal history and acknowledged the 2006-2008 dependency case; afterward, she stated, "I maintained a sober lifestyle and did benefit. Just because I relapsed doesn't mean I continue to abuse controlled substances."

Mother was raised in a home where there was domestic violence, drug and alcohol use, gang violence, and prostitution; she is estranged from her family. Mother began

3

abusing alcohol at any early age and was diagnosed with schizophrenia. Because Mother has a transient lifestyle, it is difficult to arrange visits. During visits, she made unrealistic promises to Lorenzo about finding a home and exhibited paranoia. She shows signs of a serious mental health issue. Authorities in Riverside opined that Mother could not benefit from psychotherapy until she participates in substance abuse treatment and has been sober for 30 days. Mother's sister, Maria M. (Aunt Maria), sought to become Lorenzo's caregiver.

At the jurisdiction hearing on February 11, 2013, Mother waived her right to trial. The court sustained allegations that Mother abuses meth, cares for her children while drugged, and was arrested for being under the influence and child endangerment; Mother and G.R. engage in domestic violence; Mother has a criminal history for vandalism, possession of marijuana and willful cruelty to a child; Mother has a detrimental home environment in which the children are exposed to dirt, cockroaches and dog feces, with housemates who were arrested on drug-related charges; Mother and G.R. lead a transient lifestyle and failed to provide adequate care for the children, who were dirty and unclad despite the cold weather; Mother previously received reunification services from 2006 to 2008, but continues to use drugs while caring for her children; and the whereabouts of Lorenzo's father are unknown and he does not provide care or support for his child.

At disposition, the court removed the children from parental custody. It accepted the proposed case plan, which mandates reunification services for Mother. Mother was ordered to complete parenting education; alcohol and drug testing; substance abuse treatment; and counseling.

In April 2013, the case was transferred to Los Angeles, where Mother was living, and DCFS took over. Lorenzo was placed with Aunt Maria. Mother was homeless and pregnant. On April 23, 2013, Mother informed DCFS that she was involuntarily hospitalized and would not be able to visit the children. Ten days later, Mother checked herself out of the hospital and arrived at her brother's home drunk and irate. Mother spoke with the social worker by telephone and said that she returned to Los Angeles because she was hungry and sleeping on the streets in Riverside. She was unable to

4

enroll in rehabilitation programs because they require her to be sober for 30 days. Mother resisted the social worker's efforts to meet with her.

In May 2013, Mother confirmed that she was four months pregnant, was not receiving prenatal care, and was actively using drugs. In June 2013, Mother was placed on an involuntary hold in Riverside after being arrested. She disclosed that she used meth three days earlier: "Mother stated it is very hard for her to be on the streets with drugs everywhere." Mother briefly enrolled in a substance abuse program on June 16, but left within weeks, against staff advice. Mother tested negative for drugs several times between February and July 2013, but also failed to show up for testing five times. She was provided with referrals, but failed to enroll and participate in drug treatment, parenting or counseling. Mother believed that she would be able to reunify with the children once she obtains suitable housing, and does not need to participate in a substance abuse program.

Mother had monitored visits with Lorenzo on February 11; March 11 and 25; June 12, 20 and 27; and July 5, 11 and 18. During visits in June, the social worker observed that Mother was affectionate; however, she had to be redirected after trying to discuss the dependency case, and Lorenzo called Mother "Tia" ("aunt") three times, prompting her to remind him that she is his mother. When G.R. visited Lorenzo with Mother on July 11, Lorenzo referred to G.R. as "Dad," but G.R. wanted to lay down on a sofa and sleep instead of visiting. Starting in June 2013, Mother began having monitored telephone calls with Lorenzo, who looked forward to his weekly visits with her.

G.R. informed DCFS in July 2013 that he had just used meth two days ago, and had not enrolled in a program, but he and Mother had just reunited and they want to get the children back. G.R. maintained that he was not addicted to drugs and could stop at any time, so he would not benefit from a substance abuse program. Previously, G.R. had been able to stay sober for about one month, then relapses due to "stress and problems," but does not believe he needs to learn coping skills.

Lorenzo has difficulties with speech, comprehension and communication, and was enrolled in a individualized education program. An assessment report indicated that

Lorenzo was prenatally exposed to meth. Lorenzo adjusted well to living with Aunt Maria and reported that "I sleep like a king!" Aunt Maria is dedicated to Lorenzo and willing to provide permanence though adoption.

DCFS recommended that the court terminate reunification services. The agency described Mother and G.R. as being "in complete denial about their substance abuse problem," creating a "very high" risk level if the children were returned to parental custody. At a hearing on August 12, 2013, the court found that Mother is not in compliance with the case plan and that returning the children to her would create a substantial risk of harm. The court terminated reunification services.

In December 2013, DCFS reported that Lorenzo continues to be enrolled in special education and also took a summer course to work on his speech and language skills. He was described as "smart, however is having a difficult time learning to read." He had weekly sessions with a therapist to address emotional needs, such as coping with past trauma and alleviating depression and anxiety.

As 2013 progressed, Mother visited Lorenzo three times in August, four times in September, four times in October, and once in November. "Visitation typically consists of mother bringing the child snacks and watching television." Lorenzo looks at the social worker for reassurance throughout the visits. On one visit, the monitor heard Lorenzo call Mother a "pinche cabrona" ("fucking bitch"). "Mother giggled [and] told the child not [to] say that. The child called mother the name again and she told the child, 'Don't say that; that's not nice Lorenzo.'" The monitor noted that "[w]hen mother attempts to kiss and hug the child, he has been observed to pull away from mother." Mother maintains telephone contact with Lorenzo. Initially, he spoke to her for about 30 minutes, but now he ends the calls after five to 10 minutes. During one call, Mother asked Lorenzo if he heard others' voices; however, no voices were heard by the child or the monitor.

Lorenzo's needs were met and he thrived in his placement with his aunt. He lived with her from June 2006 to July 2007 (during the first dependency case), and since April 2013. Lorenzo displays affection toward Aunt Maria, hugging and kissing her after visits

with Mother. His reading proficiency and other educational goals improved in foster care. In October 2013, Mother showed up unannounced and demanded to see the child: the caregiver saw that Mother "was behaving in a bizarre manner" and asked her to leave the property.

Mother and G.R. remain in a relationship despite unresolved domestic violence. Mother abandoned her inpatient drug treatment program when G.R. arrived in town. They are homeless. Mother gave birth in November 2013, and the newborn was immediately detained by authorities. Neither Mother nor G.R. would admit to substance abuse or participate in court-ordered services. DCFS opined that Mother did not benefit from family reunification and maintenance services provided from 2006 to 2008, as she continues to abuse substances.

Mother filed a motion for a modification on January 30, 2014, shortly before the permanent placement hearing. She had just enrolled in a six-month outpatient program with random testing and group counseling. She requested more reunification services, arguing that the change would benefit her children because they "are better off with [their] mother." An adoption home study for Aunt Maria was approved, and DCFS recommended that Mother's parental rights be terminated.

The permanent plan hearing was conducted on February 6, 2014. At the outset, the court denied Mother's request for a modification, noting that Mother "has a very long history of drug involvement" and only recently enrolled in a treatment program. Mother was "at the very beginning of addressing issues, long-standing issues, because these children have been before this court for a substantial period of time; and, therefore, it's not in their best interest to grant her request."

Mother argued that the "benefit to the child" exception to termination of parental rights applies because "[t]here has been contact. She believes it's a good quality and that the child would be affected if the [ ] parent/child relationship would be severed."

The court found by clear and convincing evidence that Lorenzo is likely to be adopted, and no evidence that it would be detrimental to terminate parental rights. It stated that Lorenzo "has resided with his maternal aunt for a substantial period of time.

7

She's taking very good care of him. He is in special education. His caretaker attends all of his school meetings to ensure that his needs are met. He has been in therapy; he is making good progress." Aunt Maria is aware of Lorenzo's needs, which pose no barrier to adoption. While Lorenzo "apparently enjoys" his visits with Mother, this "is insufficient to persuade the court that it would be detrimental to terminate parental rights."

The court terminated Mother's parental rights and identified adoption as the permanent plan. Mother was authorized to have monitored visits and telephone calls once or twice per month. Mother appeals.

## DISCUSSION

When reviewing an order terminating parental rights, we determine if substantial evidence supports the dependency court findings. Conflicts are resolved in favor of the prevailing party and all legitimate inferences are drawn to uphold the lower court's ruling. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378-1379.) We cannot reweigh the evidence or substitute our judgment for that of the trial court. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

At the selection and implementation hearing, the court must select adoption as the permanent plan and terminate parental rights if it finds that the child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re Jamie R.*, *supra*, 90 Cal.App.4th at p. 773.) Adoption is the permanent plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1368.)[3] A parent may avoid termination of parental rights by showing that it would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

Mother argues that termination of parental rights would be detrimental because she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent must show why the statutory exception applies, and that termination would be detrimental to

---

[3]    Mother does not dispute that Lorenzo is likely to be adopted.

the child.  (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  Mother carries the burden of proving that Lorenzo would be "greatly" harmed by termination of parental rights, and that she holds a "parental" role with the child.  (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466-468.)

There are two prongs to the exception:  regular visitation and a benefit to the children if the relationship were continued.  As to the first prong, Mother's visitation was only moderately consistent.  Lorenzo was detained in January 2013.  During that year, Mother visited Lorenzo once in February (on the day of the jurisdiction hearing); twice in March; and not at all in April or May.  Her visits became more consistent (three or four times per month) from June through October.  She visited Lorenzo only once in November.  The court could infer that Mother's haphazard interest in seeing Lorenzo confused the child, causing him to refer to Mother as "tia" ("aunt') and to consider Aunt Maria as his parent.

As to the second prong, the dependency court determined that there is no overriding benefit to Lorenzo if his relationship with Mother continued, or that he would be greatly harmed if it were severed.   Over the course of the proceeding, Lorenzo did not demonstrate a need to be with Mother.  He pulled away from Mother when she displayed physical affection, but was seen hugging and kissing Aunt Maria after visiting with Mother.  He looked at the social worker for reassurance when he was with Mother.  Lorenzo initially spoke with Mother for 30 minutes during telephone visits; as time passed, Lorenzo ended conversations with Mother after five to 10 minutes.  He called Mother an epithet and referred to her as his aunt.  The evidence shows a child who had grown away from his mother, not one who was suffering from her absence.

During this case, Mother rejected drug abuse treatment.  She admittedly continued to use meth after Lorenzo was removed from her custody, despite being pregnant, because she was living on the streets and could not resist, "with drugs everywhere."  Mother underwent drug rehabilitation in 2006-2008, and undoubtedly learned that using

meth while pregnant is devastating to the fetus. Nevertheless, Mother insisted that she only needs housing, and has no need to participate in rehabilitation.

Mother's failure to resolve her drug addiction twice brought her family to dependency court. She received services in the prior dependency proceeding, was given a second chance, and Lorenzo was returned to her custody. Though she claims to have benefitted from the prior reunification services, her actions speak louder than her words. Lorenzo and his baby brother were found in a drug house, with Mother, G.R., and eight other drug users, all of whom were arrested. Mother displayed complete indifference to the health and safety of her children by exposing them to drug addicts, filth, cockroaches and dog feces, with no way to prepare food for them without a stove or refrigerator. The children were unclad, in cold weather. While admitting to a relapse after receiving drug treatment in 2006-2008, Mother defiantly claimed that it "doesn't mean I continue to abuse controlled substances." Mother has no insight into her addiction, despite treatment.

Mother did not comply with any part of the court-ordered case plan. As a result of Mother's uncooperative attitude, she was unable to have unmonitored, weekend or extended visits, let alone custody. A showing that a child would be greatly harmed by termination of parental rights is difficult to make when, as here, "the parents have . . . [not] advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) A true parental relationship would not require a third party to monitor parent-child contact. Mother's visits were never liberalized because she failed to address the drug problems that led to dependency jurisdiction. In fact, she denied that she has any problems that need to be addressed.

Mother argues that her visits with Lorenzo were positive and appropriate. Even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Mother does not occupy a parental role and is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) Mother continues to be in a relationship with G.R., an admitted meth user. They

10

engage in domestic violence, and lived on the streets during this proceeding. Lorenzo could not possibly be returned to their care in the foreseeable future.

While Lorenzo is bonding with his Aunt Maria, Mother has not progressed to the point where she can have unmonitored or overnight visits, even if the visits are enjoyable for Mother and Lorenzo. A relationship that is "pleasant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Here, Lorenzo anticipated his monitored visits with Mother as he might look forward to a play date. They typically watched television together. Mother made no effort to read books with Lorenzo, to help him overcome his speech and comprehension difficulties. Their minimal interaction confers no special benefit on Lorenzo, who referred to Mother as "Tia," until Mother informed him that she is his mother, not his aunt. Lorenzo does not necessarily view Mother as his parent.

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) When Lorenzo was two, the police found him running in the street while Mother was passed out drunk in a parking lot. Mother was arrested, and Lorenzo was not reunited with her until he was three. When they reunited, DCFS had to assist Mother in managing Lorenzo's anger. When Lorenzo was seven, Mother reported to DCFS that he was living with a relative who refused to return the child to her. It is unclear how long Lorenzo lived with the relative. Soon afterward, Lorenzo was detained from Mother when she was arrested for child endangerment. Thus, several years of Lorenzo's young life have been spent away from Mother.

11

The record reveals that Lorenzo had speech problems during the first dependency proceeding in 2006-2008.  He was still suffering speech, communication and comprehension problems when removed from Mother's custody in 2013, and had to be placed in a special education program.  Mother spent time accumulating a criminal record instead of spending time addressing her child's developmental needs.

In short, it cannot be said that the time Lorenzo spent with Mother was positive.  He was neglected, and was saddened and scared by domestic violence.  Mother does not dispute that Lorenzo is thriving in his placement.  She did not carry her burden of showing that Lorenzo has an emotionally significant bond with her and would be greatly harmed by the termination of her parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home.  Where, as here, a child is likely to be adopted, the court must choose adoption over a guardianship to give him "the most permanent and secure alternative that can be afforded."  (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.